## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **C.L. "BUTCH" OTTER**, in his official capacity as Governor of the State of Idaho; and the **IDAHO STATE LEGISLATURE**, State Capitol Boise, ID 83702 | ) ) ) ) ) ) | Civil Action No. _____ |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| **S.M.R. JEWELL**, sued in her official capacity, Secretary U.S. Department of the Interior 1849 C Street, NW, Washington, DC 20240; **JANICE SCHNEIDER**, sued in her official capacity, Assistant Secretary for Land and Minerals Management; **NEIL KORNZE**, sued in his official capacity, Director of the Bureau of Land Management; **UNITED STATES BUREAU OF LAND MANAGEMENT** 1849 C Street, NW Washington, DC 20240; **THOMAS J. VILSACK**, sued in his official capacity, Secretary U.S. Department of Agriculture 1400 Independence Ave., SW, Washington, DC 20250; **THOMAS L. TIDWELL**, sued in his official capacity, Chief of the U.S. Forest Service; and **UNITED STATES FOREST SERVICE,** 1400 Independence Ave., SW, Washington, DC 20250, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |
| _____ | ) | |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Plaintiffs C.L. "Butch" Otter, Governor of the State of Idaho, and the Idaho State Legislature allege as follows:

1.   Plaintiffs GOVERNOR C.L. "BUTCH" OTTER, in his official capacity as Governor of the State of Idaho ("Governor Otter"), and the IDAHO STATE LEGISLATURE (collectively, "Plaintiffs") seek declaratory and injunctive relief for multiple violations of federal law by Defendants, S.M.R. JEWELL, in her official capacity as Secretary of the U.S. Department of the Interior; JANICE SCHNEIDER, in her official capacity as Assistant Secretary for Land and Minerals Management; NEIL KORNZE, in his official capacity as Director of the Bureau of Land Management, and the UNITED STATES BUREAU OF LAND MANAGEMENT (collectively, "Interior Defendants"); and THOMAS J. VILSACK, Secretary of the U.S. Department of Agriculture, THOMAS L. TIDWELL, Chief of the U.S. Forest Service; and the UNITED STATES FOREST SERVICE ("Agriculture Defendants") (all Defendants are collectively referred to as the, "Federal Defendants"), committed in connection with the Federal Defendants' approval and execution of the Great Basin Records of Decision.

2.   This civil action challenges the Federal Defendants' final agency action amending 64 land use plans for federally-managed lands in six western states, including such lands in the State of Idaho ("State" or "Idaho").  The agency action is based upon four Sub-regional Final Land Use Plan Amendments ("LUPAs") and Environmental Impact Statements ("FEISs") covering approximately 126 million acres.  The Federal government's action designates 35 million of these acres as greater sage-grouse ("sage-grouse") habitat.  This unprecedented land-use amendment process was finalized with the Federal Defendants' signatures on September 16, 2015 and September 21, 2015 for the U.S. Forest Service ("Forest Service") Record of Decision and the Bureau of Land Management ("BLM") Record of Decision respectively.  *See* BLM's "Record of Decision and Approved Management Plan Amendments for the Great Basin Region,

Complaint for Declaratory and Injunctive Relief - 1

including the Greater Sage-Grouse Sub-Regions of Idaho and Southwestern Montana, Nevada and Northeastern California, Oregon and Utah" and the Forest Service's "Greater Sage-Grouse Record of Decision for Idaho and Southwestern Montana, Nevada and Utah". *See Notice of Availability*, Record of Decision and Approved Land Management Plan Amendments for the Great Basin Region Greater Sage-Grouse Sub-Regions of Idaho and Southwestern Montana; Nevada and Utah, 80 Fed. Reg. 57,333 (Sept. 23, 2015); and Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region Greater Sage-Grouse Sub-Regions of Idaho and Southwestern Montana; Nevada and Northeastern California; Oregon; and Utah, 80 Fed. Reg. 57,633 (Sept. 24, 2015) (collectively, "Great Basin ROD").

3. The Great Basin ROD is one of two regional Records of Decision ("RODs") completing the August 2011 BLM National Greater Sage-Grouse Planning Strategy ("National Strategy"). The two RODs consist of a total of 15 individual FEISs and final LUPAs. Idaho is an integral part of and covered in the Great Basin ROD. This National Strategy is principally aimed at avoiding a positive listing determination for sage-grouse under the Endangered Species Act ("ESA"). In accordance with deadlines set by a settlement agreement in a previous action, the U.S. Fish and Wildlife Service ("FWS") announced on September 22, 2015 that sage-grouse is not warranted for listing under the ESA. *See In Re Endangered Species Act Section 4 Deadline Litigation*, 10-mc-00377-EGS, MDL Dkt No. 55 (D.D.C. Sept. 9, 2011).

4. Governor Otter had direct personal engagement in the development of the National Strategy, the LUPA for the Idaho and Southwestern Montana Sub-region ("Idaho LUPA") and the associated FEIS ("Idaho FEIS"). *See Notice of Availability*, Idaho and Southwestern Montana Sub-regional Greater Sage-Grouse Proposed Land Use Plan Amendment and Final Environmental Impact Statement, 80 Fed. Reg. 30,711 (May 29, 2015).

5. Then Secretary of the Interior Ken Salazar invited the western governors in

December 2011 to submit individual state-based conservation plans for inclusion in the National Strategy.

6. Governor Otter accepted Secretary Salazar's invitation and issued Executive Order 2012-02 creating the Governor's Sage-Grouse Task Force – an advisory group of diverse stakeholders, including two members from the Idaho Legislature. *See* E.O. 2012-02; available at: http://gov.idaho.gov/mediacenter/execorders/eo2012.html (last visited Sept. 23, 2015). Following the deliberations of the Task Force, the Governor analyzed its recommendations and submitted his Alternative on September 5, 2012. *See* "Federal Alternative of Governor C.L. "Butch" Otter for Greater Sage-Grouse Management in Idaho," at Executive Order 2015-04, App. 1; available at: http://gov.idaho.gov/mediacenter/execorders/eo2015.html (last visited Sept. 22, 2015) (hereinafter, "Governor's Plan" or "Alternative E").  In shortest summary, the Governor's Plan provided an innovative strategy for addressing the primary threats to sage-grouse in Idaho (i.e., wildfire, invasive species, and to a lesser extent habitat fragmentation caused by infrastructure development), while also maintaining predictable levels of land use for the state.  The Governor's Plan allocates the occupied sage-grouse habitat in Idaho (some 15 million acres) into a three-tiered habitat zoning strategy: Core Habitat, Important Habitat, and General Habitat.  Consistent with those labels, the three habitat zones represent a management continuum that includes at one end, a relatively restrictive approach aimed at providing a high level of conservation benefit to the species within the Core Habitat Zone, and on the other end, a relatively flexible approach for the General Habitat Zone providing greater flexibility for multiple-use activities.  This zoning scheme, importantly, allocates precious State and Federal agency resources to habitat areas that are most important to the species.

7. This innovative approach was not a unilateral endeavor on the part of the Otter Administration and the Idaho Legislature, and was reviewed positively by the federal agencies.

For example, BLM and Forest Service took the unusual step of selecting the Governor's Plan, largely based on FWS's recommendation, as a co-preferred alternative in the federal draft environmental impact statement.  *See Idaho and Southwestern Montana Sub-Regional Greater Sage-Grouse Draft Land Use Plan Amendment and Environmental Impact Statement* (Oct. 2013) ("Idaho DEIS").

8.   Upon information and belief, sometime after the close of the comment period on the Idaho DEIS, the Federal Defendants replaced the previously common objectives of developing collaborative solutions tailored to state-specific needs and conditions with a concerted internal push for a uniform "national" solution.  This sea change first manifested itself publicly with the release of an October 2014 internal memorandum from FWS Director Ashe to BLM Director Kornze and Chief Forester Tidwell ("Ashe Memorandum").  Based on the recommendations of the Ashe Memorandum, the Idaho FEIS for the first time set forth a new single preferred alternative not analyzed in the Idaho DEIS that replaced the Governor's three-tiered habitat approach and substituted a four-tiered approach.  The fourth tier consists of a "Sagebrush Focal Area" ("SFA") habitat zone requiring additional and excessive regulations of 3.8 million acres in Idaho.[1]  In addition, this new preferred alternative created an entirely new "net conservation gain" mitigation standard, and established uniform lek buffers (required offset distances for infrastructure projects) across the entire two-state planning area.  The environmental impacts of this alternative were not analyzed in the Idaho DEIS.

9.   The Federal Land Policy and Management Act ("FLPMA"), 43 U.S.C. §§ 1701 *et seq.*, requires BLM land use plans and amendments to be consistent with other Federal agency,

---

[1]   As described below, a critical component of the Sagebrush Focal Area habitat zone is the recommended withdrawal from mineral location and entry of ten million acres across the West.  *See Notice of Proposed Withdrawal; Sagebrush Focal Areas; Idaho, Montana, Nevada, Oregon, Utah, and Wyoming and Notice of Intent to Prepare an Environmental Impact Statement*, 80 Fed. Reg. 57,635 (Sept. 24, 2015).  This notice temporarily segregates these lands for 2 years while the application is processed under § 204 of the Federal Land Policy and Management Act.

state, and local plans to the maximum extent consistent with Federal law and FLPMA. *Id.* §

1712(c)(9). All BLM land use plans or plan amendments must undergo a 60-day Governor's

consistency review prior to final approval. 43 CFR § 1610.3-2(e). Here, Governor Otter timely

exercised his right to file a Governor's Consistency Review on July 28, 2015. In his review, the

Governor detailed how these last minute changes materially altered his conservation plan and

provided specific recommendations to reconcile the two alternatives. *See* Governor Otter's

Consistency Review, at 8-10 (July 28, 2015) (discussing BLM's consistency obligations under

FLPMA § 202(c)(9)); available at: http://gov.idaho.gov/ourgov/sage.html (last visited Sept. 22,

2015). Rather than complying with its statutory obligation to carefully consider the Governor's

objections and modify the federal plan to achieve consistency with Idaho's plan to the maximum

extent practicable, BLM provided in less than 6 business days nothing more than a 10-page

cursory response. *See* BLM Consistency Review Response (August 6, 2015); available at:

http://gov.idaho.gov/ourgov/sage.html (last visited Sept. 22, 2015). Such an abridgement of the

Plaintiffs' rights under FLPMA cannot stand. And as further evidence of their predetermined

course, Federal Defendants signed the Great Basin ROD *prior to* Governor Otter receiving a

response to his September 8, 2015 Consistency Review Appeal. *See* BLM Appeal Response

(Sept. 22, 2015); available at http://gov.idaho.gov/ourgov/sage.html (last visited Sept. 22, 2015).

    10.   Plaintiffs bring this action under Section 702 of the Administrative Procedure

Act ("APA"), seeking review of the Great Basin ROD, Idaho LUPAs, and Idaho FEIS as

contrary to FLPMA, National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4321 *et seq.*,

National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. § 1600 *et seq.*, and other federal

law.

    11.   Plaintiffs seek an order from this Court holding unlawful, enjoining

implementation of, and vacating the Great Basin ROD, Idaho LUPAs, and Idaho FEIS as

arbitrary, capricious, an abuse of discretion, and contrary to law.

12.   Federal Defendants violated NEPA and 40 CFR § 1502.9(c) by failing to prepare a draft Supplemental Environmental Impact Statement ("SEIS") on the Idaho FEIS.  At a minimum, the final action incorporates three new federal actions that were not analyzed in the Idaho DEIS: (1) the designation of 3.8 million acres of a so-called SFA habitat zone in the Idaho LUPAs based on a post-DEIS internal FWS memorandum; (2) the imposition of uniform lek buffers across all habitat zones based on a post-DEIS United States Geological Survey study; and (3) mandating a new and undefined "net conservation gain" mitigation standard based on a post-DEIS FWS Mitigation Framework.

13.   Federal Defendants violated NEPA by failing to adequately analyze (take a "hard look") at the impacts of these new and significant changes, including but not limited to the cumulative impacts of combining the four Sub-regional FEISs into the Great Basin ROD.

14.   Federal Defendants violated FLPMA Section 202(c)(9) (43 U.S.C. § 1712(c)(9)) and 43 CFR § 1610.3-2 by refusing to adopt any or all of Governor Otter's recommendations in the Consistency Review and adopting Idaho LUPAs that are not consistent with State plans, programs, and policies to the extent practicable.  The Federal Defendants did not have a rational basis for rejecting the Governor's Plan and all its elements, which balance the agencies' multiple-use mandates and meet the acknowledged objectives or "goalposts" of the FWS and the Purpose and Need Statement of the Idaho FEIS.  The Federal Defendants' rejection of the Governor's Plan, which provides a reasonable balance between state interests and national interests, was arbitrary and capricious.

15.   Federal Defendants violated FLPMA section 202(c)(9) and 43 CFR § 1610.3-2 by failing to provide the public an opportunity to comment on the recommendations contained in the Governor's Consistency Review.

16.   Federal Defendants violated FLPMA 43 U.S.C. § 1712(c)(3) and 43 CFR § 1610.7-2 by unlawfully designating 3.8 million acres of Areas of Critical Environmental Concern ("ACECs") in the Idaho LUPAs (8.4 million acres in the Great Basin ROD) without following the legally mandated process required under FLPMA and its implementing regulations.  The SFAs are nothing more than a proxy for designating widespread ACECs.  To be designated as an ACEC, the area in question must meet the "relevance" and "importance" criteria in 43 CFR 1610.7-2(a).  BLM must publish a Federal Register notice providing a 60-day comment period on proposed ACEC recommendations and resource use limitations.  43 CFR § 1610.7-2(b).  BLM failed to do so here.  Similarly, Defendant Forest Service designated 236,800 acres of "Recreational" or "Zoological Areas" without following the legally mandated process under NFMA.  *See* 46 Fed. Reg. 18,026, at 14(c) (Mar. 23, 1983).

17.   Federal Defendants acted arbitrarily and capriciously and in violation of the law by rejecting the Governor's Plan and approving the Great Basin ROD, Idaho LUPAs and Idaho FEIS.

## PARTIES

18.   Plaintiff GOVERNOR C.L. "BUTCH" OTTER is the duly elected Governor of the State of Idaho.  Under Art. IV, sec. 5 of the Idaho Constitution, the governor is the Chief Executive of the State and must ensure the laws of the State of Idaho are faithfully executed. The Federal Defendants' decision to reject the Governor's Plan in favor of the Great Basin ROD and Idaho LUPAs have impaired, impeded and directly injured his ability as the Chief Executive of the State to uphold the law, and specifically his sovereign responsibility to conserve sage-grouse.  The relief sought herein would directly redress the Governor's injuries.  He brings this action in his official capacity as the Governor of the State of Idaho.

19.   Plaintiff IDAHO STATE LEGISLATURE has the authority under Idaho Code §

67-1406 to join this civil action with Governor Otter. The Idaho State Legislature has been an integral part in the development and implementation of the Governor's Plan. The Idaho State Legislature participated as members of the Governor's Task Force pursuant to Executive Order 2012-02. One of the key Task Force recommendations to address the primary threat of wildfire was the creation and subsequent funding of Rangeland Fire Protection Associations ("RFPAs"), a nonprofit organization established to prevent and suppress range fires. Currently, there are six RFPAs operational in southern Idaho covering 3.7 million acres of key sage-grouse habitat. The Legislature passed legislation in 2013 establishing the RFPAs and committing funding for their implementation. Idaho Code § 34-104B. Most recently, in the 2015 session, the Legislature appropriated $500,000 to the implementation of the Governor's Plan. *See* S.B. 1128; available at: http://www.legislature.idaho.gov/legislation/2015/S1128.htm (last visited Sept. 23, 2015). The Federal Defendants' decision to reject the Governor's Plan in favor of the Great Basin ROD, Idaho FEIS and Idaho LUPAs has impaired, impeded and directly injured the Legislature's efforts and ability to implement the Governor's Plan. *See* 2015 House Joint Memorial No. 9; available at: http://www.legislature.idaho.gov/legislation/2015/HJM009.htm (recognizing the importance of implementing the state's plan for the species and the economy of Idaho). The relief sought herein would directly redress the Legislature's injuries.

20. Defendant S.M.R. JEWELL is the Secretary of the Department of the Interior and exercises supervisory control over the Bureau of Land Management's decisions to set public lands policy in accordance with provisions and requirements of federal law, including FLPMA. Defendant Jewell is sued in her official capacity. The Secretary's office is located in Washington, D.C.

21. Defendant JANICE SCHNEIDER is the Assistant Secretary for Land and Minerals Management. Defendant Schneider is sued in her official capacity, and is responsible

for overseeing and managing the relevant public lands under BLM authority in accordance with FLPMA and other federal law.  Defendant Schneider signed the BLM Records of Decision.  The Assistant Secretary's office is located in Washington, D.C.

22.   Defendant NEIL KORNZE is the Director of the Bureau of Land Management. Defendant Kornze is sued in his official capacity, and is responsible for managing the relevant public lands under BLM authority in accordance with FLPMA and other federal law.  The Director's office is located in Washington, D.C.

23.   Defendant UNITED STATES BUREAU OF LAND MANAGEMENT is a federal agency within the Department of the Interior and is responsible for the management of approximately 12 million acres of federal surface (nearly one-fourth of the state's total land area) and 36.5 million acres of mineral estate in Idaho.

24.   Defendant THOMAS J. VILSACK is the Secretary of the Department of Agriculture and exercises supervisory control over the U.S. Forest Service.  Defendant Vilsack is sued in his official capacity.  The Secretary's office is located within Agriculture's headquarters in Washington, D.C.

25.   Defendant THOMAS L. TIDWELL is the Chief of the U.S. Forest Service. Defendant Tidwell is sued in his official capacity.  The Chief's office is located in Washington, D.C.

26.   Defendant UNITED STATES FOREST SERVICE is a federal agency within the Department of Agriculture and is responsible for the management of approximately 20.4 million acres of federal surface acres in Idaho.

## JURISDICTION

27.   This Court has jurisdiction under 28 U.S.C. § 1331 (federal question) and the Administrative Procedure Act, 5 U.S.C. § 702 (judicial review of final agency action) to review

Federal Defendants' violations of NEPA, FLPMA, NFMA, and the APA.  This Court also can

provide relief under 28 U.S.C. § 2201 (declaratory judgment), 28 U.S.C. § 2202 (injunctive

relief), and 5 U.S.C. §§ 553, 702 and 706, regarding such violations.  Plaintiffs fully participated

at every stage of this agency action, exhausted Idaho's administrative remedies, and there is an

actual, justiciable controversy that now exists between Plaintiffs and Federal Defendants.

28.   The Federal Defendants are all agencies or officials of the United States, which

has waived sovereign immunity in this action pursuant to the APA, 5 U.S.C. § 702.

## VENUE

29.   Venue is proper in this district under 28 U.S.C. § 1391(e).  The Federal

Defendants reside in the District of Columbia and a substantial part of the events or omissions

giving rise to the claims occurred in the District of Columbia, including but not limited to, the

Federal Defendants' decision to initiate the 2011 National Strategy, reject the Governor's Plan

and execute the Great Basin ROD and Final Idaho LUPAs.   Defendants Jewell and Vilsack were

personally involved in the challenged agency action in this case.  Defendants Schneider and

Kornze signed the Great Basin ROD.  Additionally, Defendants Kornze and Tidwell were named

in the internal Ashe Memorandum that materially altered and arbitrarily rejected the Governor's

Plan for sage-grouse.  Each of the individual Federal Defendants are public officials with their

offices within this district.

## STATUTORY FRAMEWORK

30.   In undertaking the single largest land-use amendment process ever attempted by

the federal government, in 10 western states, across 165 million acres of sage-grouse habitat, and

implicating a multitude of multiple-uses on those public lands (e.g., fluid mineral development,

power line siting, renewable energy development, livestock grazing and mining), the Federal

Defendants are required to comply with multiple federal statutes.  FLPMA sets out the

requirements for amending BLM resource management plans, while NFMA sets out the requirements for amending Forest Service land and resource management plans.  The LUPA process must be conducted pursuant to NEPA.  Along with these primary land management laws for public lands, there are also activity-specific laws (e.g. General Mining Law of 1872) that are implicated in this sweeping decision.

*The National Environmental Policy Act*

31.    Congress enacted NEPA to "encourage  productive and enjoyable harmony between man and his environment; to promote efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and welfare of man; to enrich the understanding of the ecological systems and natural resources important to the Nation...."  42 U.S.C. § 4321.

32.    To achieve these objectives, NEPA requires federal agencies to prepare a detailed environmental impact statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment" before undertaking the action.  42 U.S.C. § 4332(2)(C); 40 CFR § 1502.1; *see also* BLM NEPA Handbook, H-1790-1, 3.2.1 (Jan. 30, 2008) (discussing NEPA process).  The "human environment" is defined to "include the natural and physical environment and the relationship of people with that environment."  40 CFR § 1508.14. Furthermore, when economic and social effects are interrelated with natural and environmental effects, such as the case here, "then the environmental impact statement will discuss all of these effects on the human environment."  *Id.*

33.    Prior to the issuance of a final EIS, the agency must prepare a draft EIS and submit it for public comment. The draft EIS describes the purpose and need for the proposed action, the affected environment, the alternatives (including the preferred alternative or alternatives), the environmental impacts of those alternatives, and the consultation and

coordination in which BLM engaged in developing the plan.  40 CFR § 1502.9; s*ee also* BLM

Manual H-1601-1, Land Use Planning Handbook, (Rel. 1-1693, III.A.8-9 (03/01/05).  BLM must

provide at least 90 days for the public to comment on the draft Resource Management Plan

("RMP") amendment and draft EIS.  This public comment period officially starts with the U.S.

Environmental Protection Agency publication of a Notice of Availability in the Federal Register.

34.    The contents required for a legally sufficient EIS are detailed in 40 CFR part

1502.  Among these requirements, an EIS must consider a reasonable range of alternatives to the

proposed action and "present the environmental impacts of the proposal and the alternatives in

comparative form, thus sharply defining the issues and providing a clear basis for choice among

option by the decisionmaker and the public." .  40 CFR § 1502.14.  The consideration and

evaluation of alternatives "is the heart of the [EIS]."  *Id.*   An EIS must "provide full and fair

discussion of significant environmental impacts and shall inform decisionmakers and the public

of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the

quality of the human environment."  40 CFR § 1502.1.

35.    NEPA also imposes a continuing obligation on federal agencies to supplement

an EIS.  NEPA requires the preparation of a supplemental environmental impact statement when

"[t]he agency makes substantial changes in the proposed action that are relevant to

environmental concerns; or [t]here are significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts."  40 CFR § 1502.9(c).

***The Federal Land Policy and Management Act***

36.    Congress enacted FLPMA as the primary statute governing BLM's management

of public lands and to establish uniform and coherent administration of those lands.  The statute

requires: (1) creation of resource inventories and land use plans; (2) implementation of "multiple

use" management plans; (3) designation and management of ACECs according to land use plans;

and (4) requirement that BLM planning efforts are consistent with State and local planning efforts to the "maximum extent practicable."

37.   Section 202 of FLPMA requires the Secretary of the Interior, with public participation, to "develop, maintain, and when appropriate, revise land use plans which provide by tracts or areas for the use of the public lands." *Id.* §1712(a).  In developing these land use plans, or RMPs, the BLM must rely to the extent available "on the inventory of the public lands, their resources, and other values." *Id.* §1712(c)(4).  In addition to compliance with RMPs, FLPMA mandates specific resource management standards.  The basic FLPMA management standard, applicable to all BLM decisions, is that: "In managing the public lands the Secretary shall, by regulation or otherwise, take any action necessary to prevent unnecessary or undue degradation of the lands." *Id.* § 1732(b).  This is known as the "UUD standard" and recognizes expected and reasonable degradation of public lands in the exercise of valid existing rights.

38.   The guiding principle in the management of these public lands is multiple use and sustained yield.  43 U.S.C. § 1732(a).  FLPMA defines "multiple use" as "management of public lands and their various resource value so that they are utilized in the combination that will best meet the present and future needs of the American people…." *Id.* §1702(c).  These resources include, but are not limited to, "recreation, range, timber, minerals, watershed, wildlife and fish, and natural scenic, scientific and historical values." *Id.* "Sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the public lands consistent with multiple use." *Id.* §1702(h).

39.   The "principal or major uses" of public lands include "domestic livestock grazing, fish and wildlife development and utilization, mineral exploration and production, rights-of-way, outdoor recreation, and timber production." *Id.* §1702(l).

40.   FLPMA requires the Secretary of the Interior to "allow an opportunity for public involvement and by regulation [the Secretary] shall establish procedures, including public hearings where appropriate, to give Federal, State, and local governments and the public, adequate notice and opportunity to comment upon and participate in the formulation of plans and programs relating to the management of the public lands."  43 U.S.C. § 1712(f); . § 1739(e).

41.   Section 202(c)(9) of FLPMA carves out a special role for state governors and ensures that public land use planning is not the sole province of the Federal government.  The Secretary of the Interior is required to "coordinate the land use inventory, planning, and management activities of or for such lands with the land use planning and management programs of…the States and local governments within which the lands are located…."  *Id.*  FLPMA mandates that RMPs and LUPAs must be consistent with state policies, plans, and programs, like the Governor's Plan, "to the maximum extent" consistent with federal law and the purposes of FLPMA.  *Id.*; *see also* 43 CFR § 1610.3-2(e).  The Secretary must "assure that consideration is given to those State, local, and tribal plans that are germane in the development of land use plans for public lands," and "assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal government plans…."  *Id.*

42.   To implement this direction, FLPMA allows the Governor of the state involved in an RMP amendment to identify inconsistencies between the LUPA and state policies, plans, and programs, and to provide the BLM with written recommendations for changes to the LUPA.  43 CFR § 1610.3-2(e).  If the State Director of the BLM does not accept the Governor's recommendations, as was the case here, the Governor may appeal that decision to the national BLM Director.  *Id.*  The BLM Director must accept the Governor's recommendations if he or she determines that they "provide for a reasonable balance between the national interest and the State's interest."  *Id.*  These provisions were designed to protect the interests of states whenever

federal agencies develop or implement federal land use plans.

43.   FLPMA defines ACECs as "areas within the public lands where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and safety from natural hazards."  43 U.S.C. § 1702(a).  Among other requirements, and prior to designating an ACEC, BLM must provide a 60-day period for public comment on the proposed designation.  43 CFR § 1610.7-2(b).

**The National Forest Management Act**

44.   Congress enacted NFMA in 1976 requiring the Secretary of Agriculture, who acts in this area through the U.S. Forest Service, to "assure" that national forest plans "provide for multiple use and sustained yield of the products and services obtained therefrom in accordance with the Multiple-Use Sustained-Yield Act of 1960, and in particular, include coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness." 16 U.S.C. § 1604(e).  For NFMA purposes, "multiple-use" is defined as the "management of all the various renewable surface resources of the national forests so that they are utilized in the combination that will best meet the needs of the American people" 16 U.S.C. § 531(a); and "sustained yield" is defined as "the achievement and maintenance in perpetuity of a high-level annual or regular periodic output of the various renewable resources of the national forests without impairment of the productivity of the land."  *Id.* § 531(b).

45.   NFMA directed the Secretary "in accordance with the procedures set forth in section 553 of title 5, promulgate regulations, under the principles of the Multiple-Use Sustained-Yield Act of 1960, that set out the process for the development and revision of the land management plans," and [adopt] "guidelines and standards prescribed by this [Act]."  16

U.S.C. § 1604(g).

46.   After a series of attempts and legal challenges, the current Planning Rule that governs the Forest Service's development of resource management plan amendments, such as the forest plans at issue in this case, was promulgated on April 9, 2012.  *See* National Forest System Land Management Planning, 77 Fed. Reg. 21,162 (codified at 36 C.F.R. pt. 219).

***The Administrative Procedure Act***

47.   Congress enacted the APA to standardize the way federal administrative agencies propose and establish rules and regulations.  The APA also establishes a process for judicial review of agency decisions.  Rulemaking procedures are outlined in the APA and require both notice and the opportunity to comment.  5 U.S.C. § 553.

48.   The APA also establishes a procedure for judicial review for those seeking redress of their grievances as the result of a final agency action.  *Id.* § 704.

49.   A court shall "hold unlawful and set aside agency action, findings, and conclusions found to be…arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law;…in excess of statutory jurisdiction, authority, or limitations, or short of statutory right…[or] without observance of procedure required by law."  *Id.* § 706(2)(A) and (C)-(D).

## FACTUAL BACKGROUND

***FWS 2010 Finding***

50.   This action is an outgrowth of the 2010 determination by FWS that the listing under the ESA of the greater sage-grouse was "warranted but precluded" by higher listing priorities.  *See Endangered and Threatened Wildlife and Plants; 12-Month Findings for the Petitions to List the Greater Sage-Grouse as Threatened or Endangered*, 75 Fed. Reg. 13,910 (Mar. 23, 2010) ("2010 Finding").

51.   The greater sage-grouse (*Centrocercus urophasianus*) is the largest North American grouse species.  Adult male greater sage-grouse range in length from 26 to 30 inches and weigh between 4 and 7 pounds.  Adult females are smaller, ranging in length from 19 to 23 inches and weighing between 2 and 4 pounds.  75 Fed. Reg. at 13,912.  During the spring breeding season, male sage-grouse gather together to perform courtship displays on areas called leks.  Leks range in size from less than 0.1 acre to over 90 acres.  *Id.* at 13,915.  Sage-grouse are dependent on large areas of contiguous sagebrush, and sagebrush is the most widespread vegetation in the intermountain lowlands in the western United States.  *Id.* at 13,916.

52.   Lands with habitat for sage-grouse have multiple ownerships (federal, state and private), and federal agencies manage almost two-thirds of the estimated 165 million acres of sagebrush habitats.  The BLM manages just over half of sage-grouse habitat, while the Forest Service is responsible for management of approximately 8 percent of sage-grouse habitat.  *Id.* at 13,920.  State agencies manage approximately 5 percent of sage-grouse habitats.

53.   Population numbers for sage-grouse are difficult to estimate due to the large range of the species, physical difficulty in accessing some areas, and survey protocols.  *Id.* at 13,921.  In 2008, the Western Association for Fish and Wildlife Agencies ("WAFWA") reported rangewide declines from 1965 to 2007, with declines averaging 3.1% per year.  The WAFWA analyses determined that the rate of decline slowed during 1985 to 2007, with declines averaging 1.4% per year.  *Id.* at 13,922.

54.   For Idaho, the Idaho Fish and Game ("IDFG") estimated that Idaho's sage-grouse population trend showed a significant decline between the early 1970s to the mid-1990s, likely reflecting large-scale land development and wildfire.  Starting in the late 1990s, the rate of decline began to minimize, and Idaho's recent sage-grouse population trend has been relatively stable.  Idaho's statewide population trend is up 13 percent since 2003.  This data was recently

confirmed, along with a finding that the number of male birds documented in 2015 year has

rebounded significantly from a recent low in 2013, in an August 2015 WAFWA Report.

55.   In the Great Basin, wildfire is one of the "primary factors" linked to population

declines of sage-grouse because of long-term loss of sagebrush and conversion to nonnative

grasses.  Loss of sagebrush habitat to wildfire has been increasing in the western portion of the

sage-grouse range due to an increase in fire frequency and size.  *Id.* at 13,957.  This change is the

result of incursion of nonnative annual grasses, primarily cheatgrass (*Bromus tectorum*).  The

primary threat in the eastern portion of the range is energy development.

56.   Of the five listing factors provided in Section 4(a)(1) of the ESA, the FWS

determined that Factor A, "the present or threatened destruction, modification, or curtailment of

habitat or range," and Factor D "the inadequacy of regulatory mechanisms" posed a threat to the

species now and in the foreseeable future.  With regard to Factor D, the 2010 Finding

particularly focused on lands managed by the BLM as those represent about 50% of the known

165 million acre total of sage-grouse habitat.  *Id.* at 13,920 (noting that "[t]he Federal Land

Policy and Management Act…is the primary Federal law governing most land uses on BLM-

administered lands, and directs development and implementation of Resource Management Plans

which direct management at a local level.").

57.   In response to the 2010 Finding, the Department of Interior announced its

National Planning Strategy to amend some 88 Resource Management Plans ("RMPs") pursuant

to FLPMA (BLM) and NFMA (Forest Service), and through a NEPA process to include sage-

grouse specific direction by September 2014.  *See* Bureau of Land Mgmt., Dep't of Interior,

Instruction Memorandum 2012-044, BLM National Greater GRSG Land-Use Planning Strategy

(December 2011).  That process has been coordinated under two administrative planning

regions: the Rocky Mountain Region and the Great Basin Region.  The Rocky Mountain region

includes the LUPAs in the states of Montana, North Dakota, South Dakota, Wyoming, Colorado, and portions of Utah.  The Great Basin region includes the LUPAs in California, Nevada, Oregon, Idaho, and portions of Utah and Montana.  Both the Rocky Mountain and Great Basin regions are further divided into sub-regions, which is the level of NEPA analysis for the 15 Proposed Land Use Plan Amendments/Final Environmental Impact Statements that were released in May 2015.  After a concurrent 30-day protest period and 60-day Governors' Consistency Review under FLPMA § 202(c)(9), the Federal Defendants finalized the agency action with the execution of the two RODs on September 23, 2015.

58.   Concurrent with the National Strategy announcement, the BLM established the National Technical Team ("NTT") to serve as an "independent, technical and science-based team to ensure the best information related to greater sage-grouse management is fully reviewed, evaluated and provided to the BLM for consideration in the land use planning process." Instruction Memorandum 2012-044, Appendix 1.  On December 21, 2011, the NTT released "A Report on National Greater Sage-Grouse Conservation Measures," ("NTT Report") outlining a "new paradigm" for activities conducted in sage-grouse habitat on BLM-managed lands.  *See* NTT Report at 6 (stating that "[t]hrough the establishment of the National Sage-Grouse Planning Strategy, the Bureau of Land Management has committed to a *new paradigm* in managing the sagebrush landscape") (emphasis added).

59.   According to the authors, the NTT Report provides the latest science and best biological judgment to assist in making management decisions.  One of the key recommendations was to manage priority sage-grouse habitats so that discrete anthropogenic disturbances cover less than 3% of the total sage-grouse habitat regardless of ownership. To achieve this objective, the Report recommends making priority sage-grouse habitat areas exclusion areas for new ROW permits; closing priority sage-grouse habitat to fluid mineral

leasing; and recommends withdrawal from mineral entry in priority areas.

60.   The NTT Report was met with opposition from the states and the regulated community.  For example, on February 23, 2012, Governor Mead of Wyoming wrote to BLM Director Bob Abbey expressing his concern about the NTT Report and its disregard for FLPMA's multiple-use mandate.  Similarly, the WAFWA wrote Secretary Jewell on May 16, 2013 noting that while the NTT Report provides valuable information, applying a "one-size-fits-all" approach focusing solely on the NTT Report is not appropriate for management of the variations that occur across the sage-grouse range.

### State Involvement in the National Planning Strategy

61.   Governor Otter and the other western governors were invited to submit state-based plans in this National Planning Strategy.  Along with the invitation itself, there were a couple of key aspects to a state's involvement: (1) that a state-developed plan would be incorporated and analyzed in the National Sage-Grouse Strategy; and (2) if the FWS concurred with all or portion of a state plan, that state could request exemption from the BLM's interim guidance for sage-grouse for BLM-managed land in that state.  *See* Bureau of Land Management, Dep't of Interior, Instruction Memorandum 2012-043.

62.   Governor Otter accepted this invitation and established a Sage-Grouse Task Force through Executive Order 2012-02.  The Task Force was a thirteen member group comprised of representatives from the Idaho State Legislature, local sage-grouse working groups, conservation interests, local officials, and industry.  In March through May 2012, the Task Force met eight times in various locations across the state.  Each meeting was open to the public and provided an opportunity for public comments on sage-grouse conservation in the state.  Additionally, IDFG hosted a web page displaying the times and locations of Task Force meetings, agenda, meeting notes, and presentations made during the meetings.  The Task Force

was committed to conducting an open and transparent information-gathering and decision-making process.  After much deliberation and discussion, the Task Force on June 15, 2012 – aided by the technical expertise of IDFG (including renowned sage-grouse biologists, Dr. Jack Connelly and Don Kemner), FWS, and other relevant state and federal agencies – delivered its recommendations to Governor Otter.

63.   On June 29, 2012, Governor Otter released a draft of his Alternative and provided a 30-day comment period.  During that period, the Governor sent a letter to the FWS requesting affirmance on some key aspects of his draft plan.  The Governor's Plan relies on IDFG's extensive monitoring to determine key populations and habitats, and assigns an area to a specific habitat zone within the three-tiers (i.e. Core, Important, General) with management recommendations tailored for that particular zone.  The Governor requested feedback from FWS on this three-tier scheme and in particular: a) whether the management framework represented a sound policy that should move forward; and b) whether or not the habitat zones, especially the Core Habitat Zone and Important Habitat zone, were consistent with the FWS's understanding of the most important sage-grouse habitats in the State.

64.   The FWS responded that Idaho's management framework provided a sound policy outline from which to build upon to meet the long-term conservation goals of greater sage-grouse.  The Governor's Plan reflects and incorporates the FWS adaptive management strategy for conservation.

65.   After analyzing public comments, and receiving positive review from the FWS, Governor Otter submitted his Alternative to the Secretaries of Interior and Agriculture on September 5, 2012.

### FWS Concurrence Process

66.   As another outgrowth of the December 2011 meeting, the western governors and

the Director of BLM created a Sage-Grouse Task Force to advance a coordinated, multi-state, range-wide effort to conserve the sage-grouse, including the identification of conservation objectives to ensure the long-term viability of the species.  The Sage-Grouse Task Force enlisted the assistance of the FWS Director to develop range-wide conservation objectives for the species to define the degree to which threats need to be reduced or ameliorated to conserve sage-grouse so that it is no longer in danger of extinction or likely to become in danger in the foreseeable future.  FWS recognized that state wildlife agencies have management expertise and management authority for sage-grouse, and also the agency created a Conservation Objectives Team comprised of state and FWS representatives.

67.   On March 22, 2013, the FWS released a report that emphasizes the importance of state-based plans and continuing collaboration to complete the National Strategy.  *See* U.S. Fish and Wildlife Serv., Greater Sage-Grouse (*Centrocercus urophasianus*) Conservation Objectives: Final Report (2013) ("COT Report").  Rather than dictate a "national" solution, like the NTT Report, the COT Report recommends that individual states put in place the best management practices, with monitoring and implementation, to address state- and site-specific issues.  The COT Report identified of Priority Areas of Conservation ("PACs"), described as key habitats that are essential for sage-grouse conservation.  For areas outside the PACs, the report encouraged but did not require the same level of conservation.  FWS concluded that in large measure the Governor's Plan met the parameters of the COT Report, especially the habitat map, population objectives, adaptive management triggers, and the livestock grazing management component.

68.   After submitting the Governor's Plan to the BLM in September 2012, the Otter Administration worked with FWS to refine or clarify certain aspects of Idaho's Plan in an effort to obtain "concurrence" from that agency.  After making several revisions, consistent with the

FWS's direction per the COT Report, Governor Otter submitted a concurrence request in March 2013 to FWS.  Idaho Exec. Ord. 2015-04; App. 1, pgs. 55-64.

69.    On April 10, 2013, FWS responded positively to Governor Otter's request.  "The Service remains impressed with and supportive of the science-based adaptive conservation strategy for GRSG you have created collaboratively in Idaho, for Idaho-specific needs.  In brief, the foundation of the Strategy and most of the specific elements that complete it, are solid and grounded in scientific concepts and approach important to both the Service and the Department of the Interior."  *See* Concurrence Letter from FWS to Governor Otter (Apr. 10, 2013); Idaho Exec. Ord. 2015-04, App. 2.  The FWS conditioned some of its COT Report consistency analysis upon reviewing future administrative actions by the State, including "a clearer understanding of how the Implementation Team/Commission operates to determine exceptions to CHZ development, development in IHZ, and how referenced mitigation of impacts will work."  This aspect of the Governor's Plan was completed in a July 1, 2013 letter to then Idaho BLM State Director, Steve Ellis.

### *Co-Preferred Alternative*

70.    Based on the strength of the Governor's collaborative, science-based conservation strategy, as recognized on four separate occasions by FWS, the BLM and Forest Service selected Alternative E (Governor's Plan) and Alternative D as co-preferred alternatives in the federal DEIS.  As two examples, the FWS commented on the administrative draft of the Idaho DEIS that Alternative E was the only alternative that met the parameters of the COT Report, and also submitted comments on the Idaho DEIS continuing its consistent endorsement of the Governor's Plan.  Governor Otter timely filed comments on the Idaho DEIS.

71.    The Idaho LUPA would apply to 30.1 million acres of federal surface land and approximately 32 million acres of federal subsurface mineral estate in the planning area

administered by the Idaho and Montana and the Forest Service.

72.  The Idaho DEIS analyzed four other action alternatives and Alternative A (no action alternative).  Alternative B ("NTT Alternative") divided sage-grouse habitat into a two-tier system (i.e., preliminary priority habitat and general habitat) with conservation measures focusing on the priority habitat.  The NTT Alternative proposed to adopt the stringent recommendations of the NTT Report, such as a 3% surface disturbance cap on anthropogenic disturbance.  Alternative C ("ENGO Alternative") was proposed by conservation groups and focused almost exclusively on removing livestock grazing (a recognized secondary threat by the FWS) from the landscape and proposed widespread ACECs.  Alternative D ("Modified NTT Alternative") also incorporated much of the NTT Report, but included local adjustments to the NTT Report to provide a purported balanced level of protection, restoration, enhancement, and use of resources and services to meet ongoing programs and land uses.  Similar to the Governor's Plan, the Modified NTT Alternative proposed a three-tier habitat zoning scheme: Preliminary Priority, Preliminary Medial, and Preliminary General.  Alternative F ("ENGO Alternative") was an amalgam of the NTT Alternative with additional restrictions on resource uses, such as proposing widespread designations of Areas of Critical Environmental Concern ("ACECs").

73.  The selection of co-preferred alternatives at the Idaho DEIS stage provided a solid roadmap for the Otter Administration and the federal government to reconcile the differences between the two alternatives.  Among those differences, the Modified NTT Alternative did not propose any disturbance caps but required "no net unmitigated loss" of Priority habitat; proposed a different habitat map; would not authorize any future right-of-ways ("ROW") for solar and wind development; and would not permit any future oil and gas leases in Priority areas with no to low potential.  Importantly, neither of the Preferred Alternatives

recommended additional areas for withdrawal from mineral entry.

74.   Recognizing that the differences between the two Preferred Alternatives would need to be reconciled prior to the issuance of the Idaho LUPAs and Idaho FEIS, Governor Otter in 2013 requested a meeting with Secretary Jewell to outline a potential path forward.  In October 2013, and as part of this meeting, Governor Otter wrote Secretary Jewell a memorandum outlining a collaborative process whereby Idaho and the federal government could bridge the remaining differences between the Preferred Alternatives.

75.   On May 28, 2014, Idaho BLM State Director Murphy wrote Ed Roberson (BLM Assistant Director for Resources and Planning), that the federal and state agencies, along with input from the Governor's Task Force, had worked together over several months and reconciled the two co-preferred alternatives into one cohesive approach that responded to the concerns raised by FWS and further refined the approaches previously described in the Draft EIS.  Upon information and belief, this modified alternative (i.e. combination of the Governor's Plan and Alternative D) was designated by the agencies as Alternative G2 and was the State Directors' recommended Proposed Plan for the forthcoming Idaho FEIS.

76.   Upon information and belief, sometime between Director Murphy's letter in May 2014 and October 2014, Federal Defendants made a deliberate shift to a one-size-fits-all "national" solution claiming a need for greater "uniformity" to preclude the need to list the species under the ESA.  This shift was in direct contravention to the recommendations from the State BLM Director and State FWS Director who had recommended Alternative G2 as the Proposed Plan in the Idaho FEIS.

77.   After the public comment period for the Idaho DEIS had closed, FWS sent the Ashe Memorandum to Defendants Kornze and Tidwell titled, "Greater Sage-Grouse: Additional Recommendations to Refine Land Use Allocation in Highly Important Landscapes."  The Ashe

Memorandum and associated maps identified areas representing so-called "strongholds" for

sage-grouse that, according to the memorandum, have been identified by the "conservation

community" as the "best of the best" sage-grouse habitat.  FWS did not consult or coordinate

with IDFG to ground-truth this information.  Rather, and upon information and belief, these

maps and the SFA concept originated from the environmental community as a proxy for ACECs.

The Ashe Memorandum recommended some 16.5 million acres of "stronghold areas" to be

subject to a vague "highest level of protection" standard.

76. On November 21, 2014, the United States Geological Survey published

"Conservation Buffer Distance Estimates for Greater Sage-Grouse—A Review" ("USGS Lek

Buffer Study").  According to the Idaho FEIS, the BLM reviewed the information in the study

and applied the lek buffer distances outlined in the USGS Lek Buffer Study in all habitat zones

across the planning area and in all the Proposed LUPAs in the Great Basin ROD.  In contrast, the

co-preferred alternatives in the DEIS, with the Governor's Plan recommending a 0.6 mile lek

buffers in Priority Habitat for fluid mineral development, while Alternative D recommended lek

buffers in certain circumstances (i.e., salable minerals in Priority) but did not propose uniform

lek buffers across the entire planning area regardless of the habitat quality.

79. The states were provided a copy of the Ashe Memorandum after it was sent to

the BLM and Forest Service.  Neither the Ashe Memorandum's phrase "highest level of

protections" nor the management implications of this new direction were immediately explained

to the states.  Upon information and belief, between October 2014 and February 2015, the

Department of Interior internally began filling in these information gaps.  In a February 2015

U.S. Senate Natural Resources Committee Hearing, U.S. Senator Risch (R-ID) admonished

Secretary Jewell that the designation of a fourth habitat zone (SFA Zone) in Idaho with the

proposed onerous restrictions would "move the goalposts," and threaten to undermine the strong

collaborative work in Idaho.  Secretary Jewell reaffirmed Interior's commitment to the COT

Report and assured Senator Risch and the Committee that "we've moved a long way since the

letter you referenced."[2]

80.   Despite the Governor's concern regarding these last-minute changes and

unilateral imposition of SFAs, he remained committed to implementing Idaho's plan.  On May

28, 2015, Governor Otter issued Executive Order 2015-04.  This Executive Order followed the

Idaho Land Board's and the Idaho Oil and Gas Conservation Commission's unprecedented move

to adopt a complementary conservation strategy for the species on state endowment lands.  *See*

Idaho E.O. 2015-04, App. 3.  Accordingly, the Governor's Plan has an all-lands approach to

sage-grouse conservation that the Idaho Legislature concurred with by passing House Joint

Memorial No. 9 in its 2015 legislative session.

81.   On May 29, 2015, the BLM and Forest Service released the Notice of

Availability for the Proposed Idaho LUPAs and Idaho FEIS, 80 Fed. Reg. 30,711.  The Idaho

FEIS presented a Proposed Plan that was a significant departure from the alternatives analyzed in

the Idaho DEIS.  The Proposed Plan created of a Sagebrush Focal Area Zone totaling

approximately 3.8 million acres in the Idaho FEIS (8.4 million acres across the Great Basin

ROD).  Under this zone, and in addition to the already stringent measures in the Priority Habitat

zone, the SFA habitat zone includes the following additional management measures: (1)

recommend for withdrawal from the General Mining Act of 1872, subject to valid existing

rights; (2) managed as NSO [No Surface Occupancy], without waiver, exception, or

modification, for fluid mineral leasing (i.e. oil and gas development); and (3) prioritized for

management and conservation actions in these areas, including, but not limited to review of

livestock grazing permits/leases.  None of these significant changes were made available for

---

[2]   *See* Phil Taylor, "Senator says FWS Memo 'Moves the Goal Post' on Grouse Listing," E&E News (Feb. 24,
2015); available at: http://www.eenews.net/eenewspm/2015/02/24/stories/1060013956 (last visited Sept. 15, 2015).

public comment and scrutiny.  BLM has already initiated the mineral withdrawal process.  *See* Notice of Proposed Withdrawal; Sagebrush Focal Areas; Idaho, Montana, Nevada, Oregon, Utah, and Wyoming and Notice of Intent to Prepare an Environmental Impact Statement, 80 Fed. Reg. 57,635 (Sept. 24, 2015) (this notice temporarily segregates the identified 10 million acres for up to 2 years while the application is processed under § 204 of FLPMA).

82.   Despite repeated attempts to reconcile these differences, and with no indication of meaningful progress, Governor Otter wrote Secretary Jewell on June 18, 2015 explaining that he would exercise his right to file a protest pursuant to 43 C.F.R. § 1610.5-2, and complete a Governor's Consistency Review in accordance with 43 C.F.R. § 1610.3-2(e).

**Consistency Review Process**

83.   Governor Otter duly filed his Protest with Defendant Kornze on June 29, 2015. The Federal Defendants made no material changes to the Proposed Plan in response.  Governor Otter then exercised his right under FLPMA § 202(c)(9) and filed an 85-page Consistency Review with BLM State Director Murphy and Regional Forester Rasure on July 28, 2015.

84.   The Governor outlined six key aspects of the Proposed Plan that were inconsistent with State plans: (1) designating approximately 3 million acres of so-called Sagebrush Focal Areas; (2) rendering Idaho's scientifically-based map moot by imposing unreasonable lek buffers, new mitigation standards and other onerous project-level restrictions across the entire planning area regardless of the quality of sage-grouse habitat; (3) relying on a previously undisclosed threat aggregation scheme to elevate secondary threats such as livestock grazing and mining to a primary focus; (4) departing, or at a minimum, convoluting, Idaho's adaptive management construct; and (5) diverting precious agency resources away from the primary threats in Idaho (i.e., wildfire and invasive species) to the detriment of the species; and (6) failing to fully protect valid existing rights.  *See* Governor's Consistency Review.  The

Governor also made specific recommendations for reconciling these inconsistencies. *Id.*

85.  State Director Murphy responded to the Governor's Consistency Review in less than six business days on August 6, 2015.  Other than some general pledges to continue working together, BLM adopted none of the Governor's recommendations for resolving inconsistencies. Moreover, much of the 10-page cursory response largely reflected the cursory responses sent to other western governors.  This failure to meaningfully consider and respond to the Governor's recommendations violated BLM's consistency obligations under FLPMA.

86.  Accordingly, Governor Otter filed, pursuant to 43 CFR § 1610.3-2(e), an appeal to Defendant Kornze on September 8, 2015.  The appeal highlighted the fact that Director Murphy's response was woefully inadequate, applied the wrong standard of review under FLPMA, and relied on post-hoc rationalizations.  Contrary to BLM's position, the Governor's Plan is consistent with federal law and policy, as evidence by its adoption in the Idaho DEIS as a co-preferred alternative.  Had it not been consistent, Federal Defendants should have classified it as an "alternative considered but eliminated from detailed analysis" at the DEIS stage.  In sum, the BLM's rejection of the Governor's Consistency Review and its recommendations constituted an "unreasonable" imbalance between national interest and the State's interests violating 43 U.S.C. § 1712(c)(9); 43 CFR § 1610.3-2(e).

87.  Repeating the pattern of Director Murphy's response, Interior Defendants emailed Director Kornze's response to the Governor's Appeal on September 22, 2015.  This response was made after the Great Basin ROD was signed.  The Great Basin ROD erroneously concludes that Governor Otter's Plan was not adopted because portions of the Idaho's strategy was inconsistent with federal law and policy.

88.  Plaintiffs are greatly concerned that elevating these secondary threats in Idaho (i.e. livestock grazing, hardrock mining) to primary threat status will divert precious agency

Complaint for Declaratory and Injunctive Relief - 29

resources away from the actual and acknowledged primary threats (i.e. wildfire, invasive

species) to sage-grouse.  This stands in direct contradiction to the Governor's Plan to direct and

maximize agency resources to deal with the highest threats in the best habitat.  This diversion, in

turn, will likely exacerbate the threat and severity of wildfire causing greater environmental risk

and costs to Idaho.  The Governor raised this issue throughout the Consistency Review process,

and as reflective of that inadequate and unlawful process, the Federal Defendants simply ignored

an important aspect to this issue.

89.     To be sure, Plaintiffs appreciate the significant efforts expended by Federal

Defendants to complete this unprecedented National Strategy aimed at precluding the need to list

the species under the ESA.  Plaintiffs share the common objective of avoiding the significant

economic impacts that an ESA listing decision would mean for Idaho and the West.  But

sometimes the cure is worse than the disease.

## CLAIMS FOR RELIEF

### COUNT I

**(Federal Defendants failed to prepare a Supplemental Environmental Impact Statement
pursuant to NEPA)**

90.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1

through 89 of this Complaint, as though fully set forth below.

91.     NEPA imposes an obligation on federal agencies to develop and put out for

public comment a supplemental EIS when "[t]he agency makes substantial changes in the

proposed action that are relevant to environmental concerns; or [t]here are significant new

circumstances or information relevant to environmental concerns and bearing on the proposed

action or its impacts."  40 CFR §1502.9(c)(1).

92.     Federal Defendants violated NEPA and 40 CFR § 1502.9(c)(1) by failing to

prepare a draft SEIS fully disclosing and analyzing the changes made to the LUPAs, as presented

in the Idaho FEIS, in response to the Ashe Memorandum, the USGS Lek Buffer Study, and the significant shift to the new "net conservation gain" mitigation standard. These new and significant changes have direct bearing on the final agency action and its direct, indirect and cumulative impacts as well as the interface between these last-minute changes and the human environment.

93.   Release of the internal Ashe Memorandum, which formed the basis for the designation of the SFA habitat zone, the USGS Lek Buffer Study, which formed the basis for imposing uniform lek buffers across the planning area, and the significant shift to the new "net conservation gain" mitigation standard all occurred after the close of comments on the Idaho DEIS and were not reflected in that document.  Collectively, this new information paints a significantly different picture than analyzed in the Idaho DEIS because these changes were not a minor variation nor qualitatively within the spectrum of alternatives discussed at the DEIS stage.

94.   This new information effectuated significant changes to the proposed action not subject to public scrutiny through the NEPA process, especially given the fact that Federal Defendants took the unusual step of selecting co-preferred alternatives at the DEIS stage.  The following changes were either not analyzed in any of the Idaho DEIS alternatives, or were analyzed but rejected by the agencies at that stage: (a) creating a fourth habitat zone (the SFA zone); (b) proposing the largest recommended mineral withdrawal under § 204 of FLPMA even though the agency had rejected a virtually identical approach in Alternative B; (c) designating *de facto* ACECs without following the requisite process even though the agency had rejected a virtually identical approach in Alternative F; (d) imposing uniform lek buffers, with limited opportunity for variance, across the entire planning area; (e) imposing an undefined "net conservation gain" mitigation standard for all third party actions across the entire planning area. In short, the shift to a "national" solution subjected Idaho and the public to a new proposed

action that was not analyzed in the Idaho DEIS.  Contrary to Federal Defendants' assertion in the Idaho FEIS, these changes were not "within the spectrum of alternatives analyzed" in the Idaho DEIS.

95.    Accordingly, Federal Defendants have violated NEPA and the APA by failing to issue a draft SEIS analyzing the impacts of these new and significant changes; explaining how the final LUPAs better meet the Purpose and Need as compared to the Governor's Plan; and as such, Federal Defendants' failure is arbitrary, capricious, an abuse of discretion, otherwise not in accordance with law, and without observance of procedure required by law.

96.    Federal Defendants also violated NEPA by adopting a proposed action in the Idaho FEIS that incorporates portions of alternatives analyzed but rejected at the DEIS-stage (e.g. ACEC analysis), without providing an additional opportunity to comment.

## COUNT II

**(Federal Defendants violated NEPA by failing to take a "hard look" at the significant impacts of the post-DEIS "national" direction, including the cumulative impacts of the Great Basin ROD)**

97.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 96 of this Complaint, as though fully set forth below.

98.    The Idaho FEIS incorporates a number of changes in the proposed action without adequate evaluation of the impacts of those changes, and in addition to the changes departing significantly from the analysis presented in the Idaho DEIS.  40 CFR § 1502.1.  The Idaho FEIS also fails to adequately consider the cumulative impacts of actions that the Federal Defendants have proposed implementing across the entire planning area.  40 CFR § 1508.25(a)(2).  The direct, indirect and cumulative impacts not properly analyzed under NEPA include, but are not limited to, the following:

a)      The Idaho FEIS does not adequately analyze the impacts from imposing NSO (No Surface Occupancy) zones, recommending widespread withdrawal from mineral entry, and imposing new conservation measures on livestock grazing across approximately 8.4 million acres.  The Idaho FEIS does not provide a meaningful discussion of the impacts (economics, diversion of resources, or otherwise) of these proposed actions on the affected states, including Idaho, and on the human environment;

b)      The Federal Defendants applied too narrow a geographic scope to the cumulative impact analysis presented in the Idaho FEIS and the other FEISs that have been rolled together into the Great Basin ROD.  The scope of the Federal Defendants' coordinated land use actions extends across all federally-managed sage-grouse habitat in the Western United States.  The Federal Defendants failed to analyze the cumulative effects of their actions, and in particular the impacts on the culture and economic resources across the planning area affected by the Federal Defendants' coordinated actions, including the effects of the SFA zones on human uses of federal lands.  Instead, the Federal Defendants improperly circumscribed their cumulative impacts analysis to sub-regional sage-grouse areas, the boundaries of which have no bearing on the actual impacts of the Defendants' actions on the human environment;

c)      Federal Defendants' decision to elevate the secondary threats of livestock grazing and hardrock mining to primary threat status specifically by adoption of the SFA Habitat Zone (and generally across the planning area) was not adequately analyzed, and is contrary to the requirement to use the best available science, 36 CFR § 219.3; *see also* 40 CFR §§ 1500.1(b), 1502.24;

d)      Federal Defendants failed to adequately analyze the impacts of the decision to establish SFAs as a fourth land use zone in the Idaho LUPA.  In addition, by unlawfully avoiding the regulatory process for designating ACECs (BLM) and Zoological Areas

(Forest Service) simply by renaming these areas as SFAs, Defendants violated NEPA's commitment to "ensure a process"; and is therefore, arbitrary and capricious; and

        e)     Federal Defendants failed to analyze any alternative to the management standard adopted in the final action.  The Idaho FEIS does not analyze an alternative to the "net conservation gain" standard, such as the "no net loss" standard analyzed in the Idaho DEIS or the statutory "unnecessary or undue degradation" standard; and accordingly, the failure to sharply contrast these alternative mitigation standards in the Idaho FEIS is arbitrary and capricious.

        99.   Accordingly, the Great Basin ROD and the Idaho FEIS were not adopted in compliance with NEPA, are unlawful and should be set aside.

## COUNT III

**(Interior Defendants did not ensure that the Governor's Plan and the Federal Plan were "consistent to the maximum extent" as required by FLPMA)**

        100.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 99 of this Complaint, as though fully set forth below.

        101.   FLPMA section 202(c)(9) requires the Interior Defendants to ensure that land use plans are "consistent with state and local plans to the maximum extent," consistent with federal law and the purposes of FLPMA.  Interior Defendants violated FLPMA section 202(c)(9) (43 U.S.C. § 1712(c)(9)) and 43 CFR § 1610.3-2(e) by refusing to accept Governor Otter's Plan (Alternative E), the compromise Alternative G2, or any of the recommended changes to the Idaho LUPA presented in the Governor's July 28, 2015 Consistency Review.  This rejection constituted an unreasonable imbalance between the national interest and the State of Idaho's interest in contravention of Secretary's consistency obligations to Governor Otter.  Moreover, the Interior Defendants violated FLPMA by determining that Governor Otter's Consistency Review recommendations, including removing the SFA Habitat Zone, either failed to identify an inconsistency or that the Governor's Plan was inconsistent with Federal law.  If that were true,

Complaint for Declaratory and Injunctive Relief - 34

the Governor's Plan would have been classified as "an alternative considered but rejected for further analysis" in the Idaho FEIS and certainly would not have been selected as a co-preferred alternative.  Both of those specious post-hoc rationalizations cannot be squared with the underlying record.

102.   After four years of collaboration and significant resources expended by Idaho, Interior Defendants curtailed the Plaintiffs' rights under FLPMA simply to meet a deadline set in an ESA settlement agreement that was agreed to without the participation of any of the impacted states.  Rather than request an extension from the court, Interior Defendants chose to summarily dismiss the legitimate issues in the Governor's 80-page Consistency Review in less than one week.  That rejection came in the form of a 10-page form letter only somewhat tailored to the Governor's concerns.  This pattern continued with Governor Otter receiving Defendant Kornze's 8-page rejection letter *after* the execution of the ROD.  Interior Defendants' failure to give more than a *pro forma* consideration to the Governor's Consistency Review recommendations is arbitrary and capricious and constitutes a violation of the APA and FLPMA.

## COUNT IV

### (Interior Defendants violated FLPMA by unlawfully designating 3.8 million acres of ACECs in BLM's Idaho LUPA)

103.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 102 of this Complaint, as though fully set forth below.

104.   Under FLPMA, BLM can only designate ACECs according to the criteria outlined in 43 CFR § 1610.7-2. To be considered as a potential ACEC, the area in question must meet both the "relevance" and "importance" criteria.  *Id.*; *see also* BLM Handbook 1613.1.  An area is "relevant" if there is "significant historic, cultural, or scenic value; a fish or wildlife resource or natural system or process; or natural hazard."  43 CFR § 1610.7-2(a)(1).  To satisfy the "importance" prong generally requires the relevant areas to have "substantial significant

value," and more than just "local significance and special worth, consequence, meaning, distinctiveness, or cause for concern."  43 CFR § 1610.7-2(a)(2).  If an area meets both tests, and preceding the draft RMP or amendment, the State Director shall publish a notice in the Federal Register describing the ACEC and provide a 60-day public comment period.  The final approval of the RMP or RMP amendment "constitutes formal designation of any ACEC involved."  *Id.* at § 1610.7-2(b).

105.   BLM analyzed the designation of ACECs in the Idaho DEIS (Alternatives C (3.6 million acres) and F (7.8 million acres)).  BLM described an ACEC for sage-grouse as including the following restrictions, "NSO [No Surface Occupancy], ROW [Right-of-Way] exclusion or avoidance, and locatable mineral withdrawal recommendations, as well as other use constraints."  Idaho DEIS at 2-61.  BLM rationally rejected the widespread designation of ACECs in the Idaho DEIS, and certainly no notice was ever published in the Federal Register designating widespread ACECs.

106.   Yet in the Idaho LUPA, Interior Defendants designated 3.8 million acres of SFAs that are *de facto* ACECs as evidenced by the fact that the description of the SFAs is identical to the description of ACECs in the Idaho DEIS.  Governor Otter raised this issue in his Consistency Review noting that BLM cannot skirt the process of designating an ACEC simply by calling these areas a "Sagebrush Focal Area."  Interior Defendants ignored this issue in their response.

107.   Accordingly, the Great Basin ROD and the Idaho LUPAs violates FLPMA and the APA and must be set aside as unlawful.

## COUNT V

**(Agriculture Defendants violated NFMA by unlawfully designating Recreation Areas)**

108.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1

through 107 of this Complaint, as though fully set forth below.

109.   Agriculture Defendants violated NFMA by unlawfully designating 236,800 acres of Recreation/Zoological Areas in Idaho.  Under NFMA, "recreational areas" are areas "other than wilderness or wild areas, which should be managed principally for recreation use." 36 CFR § 294.1.  Notwithstanding this label, these "recreational areas" can include "Zoological Areas," which are Forest Service areas that include "animal specimens, animal groups, or animal communities that are significant because of their occurrence, habitat, location, life history, ecology, rarity, or other features."  Forest Service Manual 2372.05.  The designation of such areas "shall constitute a formal closing of the area to any use or occupancy inconsistent with the classification."  36 CFR § 294.1(b).  Zoological areas greater than 100,000 acres must be designated by the USDA Secretary.  *Id.* at 294.1(a).  Further, the Chief of the Forest Service (Defendant Tidwell) must "notify the House Committee on Interior and Insular Affairs and the Senate Committee on Energy and Natural Resources of any pending designation of 100,000 acres or larger and of any proposal to withdraw 5,000 acres or more from application of the mining laws."  Forest Service Manual 2372.04b.  The Agriculture Defendants did not take these legally required actions.

110.   Accordingly, the Agriculture Defendants unlawfully designated Recreational/Zoological Areas without following the requisite process under the NFMA.  The Great Basin ROD and Idaho LUPAs must be set aside as unlawful.

## COUNT VI

**(Interior Defendants violated their congressional mandate under FLPMA to manage these public lands for multiple-use and sustained yield)**

111.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 110 of this Complaint, as though fully set forth below.

112.   There is nothing in FLPMA requiring third party actions to offset their impacts

to achieve a "net conservation gain."  BLM can only condition land uses to avoid "unnecessary or undue degradation" ("UUD") to the public lands.  43 U.S.C. § 1732(b).  By its own terms, the UUD standard provides for both reasonable and expected impacts consistent with the agency's multiple-use mandate.  In this district, the UUD standard has been interpreted as undue or excessive and something more than the usual effects anticipated from a given land use.  And this standard must be applied in light of FLPMA's overarching mandate that the BLM employ principles of multiple use and sustained yield.  43 U.S.C. § 1732(a).

113.   Instead of the multiple-use, sustained yield and UUD management standards required by FLPMA, the Interior Defendants have unlawfully applied what amounts to a recovery standard derived from the ESA.  This heightened standard is inconsistent with BLM's statutory mandates under FLPMA.

114.   Accordingly, BLM's decision to modify the statutory mitigation standard exceeded the agency's statutory authority and violated FLPMA's mandate to manage these lands for multiple-use and sustained-yield.  The Great Basin ROD and Idaho LUPAs are contrary to law and must be set aside.

## COUNT VII

**(Federal Defendants unlawfully abdicated their independent legal authority to the FWS)**

115.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 114 of this Complaint, as though fully set forth below.

116.   Federal Defendants' decision to create the SFA Habitat Zone, impose the "net conservation gain" mitigation standard, require a unanimous vote – including concurrence from the FWS – before granting an exemption to the NSO stipulation in Priority Habitat, and impose project-level disturbance caps in the Idaho LUPAs/FEIS exceeds Federal Defendants' authority under FLPMA and NFMA because these critical decisions unlawfully delegated decisionmaking

authority to the FWS.  In an apparent effort to avoid a positive ESA listing, the Idaho LUPAs have given the FWS an unconditional veto over land use management decisions regarding an unlisted species, especially with regard to the NSO exemption in Priority Habitat.

117.   Congress delegated to the Secretaries of Interior and Agriculture under FLPMA and NFMA respectively to manage for multiple-use and sustained yield.  Congress delegated to the Secretary of Interior, by and through the FWS, to list and provide for the conservation of imperiled species under the ESA.  16 U.S.C. §§ 1531-43.  However, Congress did not delegate to the FWS the authority to manage unlisted species on federal, state, or private land with effective veto power over land management decisions.  The resulting land use restrictions are actually more stringent than would result from consultation under section 7 of the ESA had the species been listed under that statute.

118.   Similarly, the FWS's veto authority is an unconstitutional infringement on Idaho's authority to manage its wildlife.  Congress has not provided any authority to the FWS to make habitat decision for unlisted species, and is therefore, inconsistent with state and federal law.  *See also* Executive Order 13132, President William J. Clinton, Aug. 4, 1999, 64 Fed. Reg. 43,255, at § 2(i).

119.   Accordingly, the Great Basin ROD and the Idaho LUPAs are unlawful and must be set aside.

## COUNT VIII

**(The Great Basin ROD, Idaho LUPAs and Idaho FEIS are Arbitrary and Capricious)**

120.   Plaintiffs incorporate by reference the allegations contained in paragraphs 1 through 119 of this Complaint, as though fully set forth above.

121.   The APA authorizes judicial review of final agency action that exceeds statutory authority, without observance of lawful procedure; and is therefore, arbitrary,

capricious, or not in accordance with law.  5 U.S.C. § 706(2).

122.   The Federal Defendants' rejection of Governor Otter's plan without explanation or analysis, the imposition of several last-minute changes from Washington, DC, and the elevation of secondary threats to primary status without analysis, and many other issues where the Federal Defendants have not provided a rational connection between the facts found and the decision made renders the final agency action arbitrary, capricious and not in accordance with the law.  Accordingly, this Court may hold unlawful, enjoin and vacate the Great Basin ROD, Idaho LUPAs, and the Idaho FEIS.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.   Declare that Federal Defendants violated the APA in executing the Great Basin ROD.

2.   Declare that the Great Basin ROD is contrary to federal law, including NEPA, FLPMA, and NFMA, or is otherwise arbitrary, capricious, an abuse of discretion, in excess of statutory jurisdiction, authority, or limitations, or *ultra vires*;

3.   Enter an order setting aside, vacating and remanding the Great Basin ROD, Idaho LUPAs and the Idaho FEIS;

4.   Enjoin and restrain Federal Defendants, their agents, employees, successors, and all persons acting in concert or participating with them from enforcing, applying, or implementing (or requiring others to enforce, apply, or implement) the Great Basin ROD and the Idaho LUPAs;

5.   Grant Plaintiffs their reasonable attorney fees and costs;

6.   Remand these actions to Federal Defendants for further action as directed by the Court; and

7.   Grant Plaintiffs such other relief as may be necessary and appropriate or as the Court

deems just and proper.

DATED this 25th day of September, 2015.

Respectfully submitted,

*/s/ Cally A. Younger*
Cally A. Younger, Idaho Bar # 8987, *pro hac vice application pending*
Office of Governor C.L. "Butch" Otter
P.O. Box 83720
Boise, ID, 83720
Phone: 208-334-2100
Fax: 208-334-3454
Email: cally.younger@gov.idaho.gov

*/s/ Samuel J. Eaton*
Samuel J. Eaton (ISB No. 8974), *pro hac vice application pending*
Governor's Office of Species Conservation
304 N. 8th St., Ste. 149
Boise, Idaho 83702
Phone: 208-334-2189
Fax: 208-334-2172
Email: sam.eaton@osc.idaho.gov

*/s/ Scott N. Pugrud*
Scott N. Pugrud, ISBA#8883, *pro hac vice application pending*
Idaho Governor's Office of Energy Resources
304 North 8th Street, Suite 250
Boise, Idaho 83720
Phone: 208-332-1679
Fax: 208-332-1661
Email: scott.pugrud@oer.idaho.gov

Attorneys for C.L. "BUTCH" OTTER, in his official capacity as Governor of the State of Idaho

*/s/ Linda R. Larson*
*/s/ Svend A. Brandt-Erichsen*
Linda R. Larson, WSBA #9171, DC Bar No. MI00059
Svend A. Brandt-Erichsen, WSBA #23923, *pro hac vice application pending*
Marten Law PLLC
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: 206-292-2600
Fax: 206-292-2601
Email: llarson@martenlaw.com
        svendbe@martenlaw.com

*/s/ Thomas C. Perry*
Thomas C. Perry, ISB #7203, *pro hac vice application pending*
Marten Law PLLC
800 West Main Street, Suite 1460
Boise, ID 83702
Phone: 208-999-5900
Email: tperry@martenlaw.com

Attorneys for C.L. "BUTCH" OTTER, in his official capacity as Governor of the State of Idaho, and the IDAHO STATE LEGISLATURE