# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
|  )
**C.L. "BUTCH" OTTER**, in his official capacity )
as Governor of the State of Idaho, *et al.*, )
)                      **No. 15-cv-01566-EGS**
Plaintiffs, )
)
v. )                      ORAL ARGUMENT REQUESTED
)
**S.M.R. JEWELL**, sued in her official capacity, )
Secretary, U.S. Department of the Interior, *et al.*, )
)
Defendants. )
_____)


# MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 3

    A.    Factual Background ................................................................. 3

    B.    Procedural History ................................................................. 5

        1.    Coordinated State and Federal planning for sage-grouse conservation from 2011-2014. .....5

        2.    Release of the Draft EIS in 2013. ...............................8

        3.    Post-DEIS Federal abandonment of Idaho's cooperative process in 2014. .....10

        4.    Release of the FEIS and Proposed Plan in 2015. .....12

        5.    Protest and Consistency Review process and final action in 2015. .....13

ARGUMENT ................................................................................................. 14

I.    PLAINTIFFS HAVE STANDING ............................................................ 14

II.    LEGAL STANDARDS .................................................................. 16

III.    PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS ................ 17

    A.    Defendants violated NEPA by failing to prepare a Supplemental Environmental Impact Statement .....17

        1.    Defendants' eleventh hour changes compel additional environmental analysis and public review. .....18

            a.    "Net conservation gain" mitigation standard. .....19

            b.    Sagebrush Focal Areas. .....21

            c.    Uniform lek buffers. .....23

    B.    Defendants violated FLPMA and NFMA by creating 3.8 million acres of de facto ACECs and zoological areas without following the required process .....25

        1.    Process for ACEC designation .....25

        2.    Process for Zoological Area designation .....27

        3.    Defendants violated FLPMA and NFMA .....28

    C.    The "net conservation gain" management standard adopted by BLM violates FLPMA .....30

        D.      Interior Defendants violated FLPMA section 202(c)(9) in adopting the Great Basin ROD and Idaho LUPAs. .................................................................. 34

              1.      The Great Basin ROD and Idaho LUPAs directly conflict with the Governor's Plan ........................................................................................35

              2.      Defendants made no meaningful attempt to reconcile state and federal plans to the maximum extent practicable.....................................................36

              3.      Interior Defendants also violated their FLPMA consistency obligations by failing to circulate the Governor's recommendations for public review. .....................................................................................37

IV.     PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION. ......................................................... 38

V.      THE BALANCE OF EQUITIES TIPS STRONGLY IN FAVOR OF A PRELIMINARY INJUNCTION. .................................................................................. 41

VI.    A PRELIMINARY INJUNCTION WOULD BE IN THE PUBLIC INTEREST ........... 43

CONCLUSION.................................................................................................................... 45

TABLE OF AUTHORITIES

**Cases**

*Back Country Horsemen of America v. Johanns,*
  424 F. Supp. 2d 89 (D.D.C. 2006) ....................................................................... 16

*Bennett v. Spear,*
  520 U.S. 154 (1997) ............................................................................................ 14, 15

*Bowen v. Massachusetts,*
  487 U.S. 879 (1988) .................................................................................................. 38

*Brady Campaign to Prevent Gun Violence v. Salazar,*
  612 F. Supp. 2d 1 (D.D.C. 2009) ...................................................................... 39, 41

*Brendsel v. Office of Fed. Hous. Enter. Oversight,*
  339 F. Supp. 2d 52 (D.D.C. 2004) .......................................................................... 38

*California Coastal Com'n v. Granite Rock Co.,*
  480 U.S. 572 (1987) ............................................................................................ 27, 34

*California v. Block,*
  690 F.2d 753 (9th Cir.1982) .................................................................................... 23

*Chem. Weapons Working Group v. U.S. Dep't of Defense,*
  655 F. Supp. 2d 18(D.D.C. 2009) ........................................................................... 16

*Citizens Against Rails–to–Trails v. Surface Transp. Bd.,*
  267 F.3d 1144 (D.C. Cir. 2001) .............................................................................. 17

*City of Grapevine, Tex. v. DOT,*
  17 F.3d 1502 (D.C. Cir. 1994) ................................................................................ 17

*City of Olmsted Falls v. F.A.A.,*
  292 F.3d 261 (D.C. Cir. 2002) ........................................................................... 17, 24

*Com. of Mass. v. Watt,*
  716 F.2d 946 (1st Cir. 1983) .................................................................................... 25

*Corridor H Alternatives, Inc. v. Slater,*
  982 F. Supp. 24 (D.D.C.1997) ................................................................................ 19

*Davis v. Latschar,*
  83 F. Supp. 2d 1 (D.D.C.1998), *adopted and aff'd,* 202 F.3d 359 (D.C. Cir. 2000) ............... 19

*Davis v. Pension Benefit Guar. Corp.,*
  571 F.3d 1288 (D.C. Cir. 2009) .............................................................................. 16

*Defenders of Wildlife v. Andrus,*
  627 F.2d 1238 (D.C. Cir. 1980) (quoting S. Rep. No. 94-583 (1975)) .................... 26

*District of Columbia v. Greene,*
  806 A.2d 216 (D.C. Cir. 2002) ................................................................................ 41

\*     *Dubois v. U.S. Dep't of Agric.*,
     l02 F.3d 1273 (1st Cir. 1996) ................................................................. 22

*Essex County Preservation Ass'n v. Campbell*,
     399 F. Supp. 208 (D. Mass. 1975) ......................................................... 25

*FBME Bank Ltd. v. Lew*,
     --- F. Supp. 3d---, 2015 WL 5081209 (D.D.C. Aug. 27, 2015). ............. 17

*Federal Forest Resource Coalition v. Vilsack*,
     -- F. Supp. 3d ---, CA No. 12-1333 (KBJ), 2015 WL 1906022 (D.D.C. April 28, 2015) ........ 27

*Florida Power & Light Co. v. United States*,
     846 F.2d 765 (D.C. Cir. 1988) ............................................................... 19

*Fund for Animals v. Babbitt*,
     903 F. Supp. 96 (D.D.C. 1995) ............................................................... 16

*Fund for Animals v. Norton*,
     322 F. 3d 728 (D.C. Cir. 2003) .............................................................. 15

*Georgia v. Tenn. Copper Co.*,
     206 U.S. 230 (1907) ............................................................................... 15

*In Re Endangered Species Act Section 4 Deadline Litigation*,
     10-mc-00377-EGS, MDL Dkt No. 2165 (D.D.C. Sept. 9, 2011) ........... 5

\*     *Klamath Siskiyou Wildlands Center v. Boody*,
     468 F.3d 549 (9th Cir. 2006) ................................................................. 21

*Lands Council v. Powell*,
     395 F.3d 1019 (9th Cir. 2005) ............................................................... 27

\*     *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*,
     752 F.3d 755 (9th Cir. 2014) ................................................................. 20

*Lemon v. McHugh*,
     668 F. Supp. 2d 133 (D.D.C. 2009) ....................................................... 24

*Lexmark Int'l, Inc. v. Static Control Components, Inc.*,
     134 S. Ct. 1377 (2014) ........................................................................... 15

*Lujan v. Defenders of Wildlife*,
     504 U.S. 555 (1992) ............................................................................... 14

*Marsh v. Oregon Nat. Res. Council*,
     490 U.S. 360 (1989) ......................................................................... 17, 24

*Massachusetts v. EPA*,
     549 U.S. 497 (2007) ......................................................................... 15, 16

*Mineral Policy Ctr. v. Norton*,
     292 F. Supp. 2d 30 (D.D.C. 2003) ................................................... 31, 32

*Mott Thoroughbred Stables, Inc. v. Rodriguez*,
     87 F. Supp. 3d 237 (D.D.C. 2015) ........................................................ 16

*Nat'l Committee for the New River v. F.E.R.C.*,
   373 F.3d 1323 (D.C. Cir. 2004) ......................................................................... 18

*Natural Res. Def. Council v. Lujan*,
   768 F. Supp. 870 (D.D.C. 1991) ...................................................................... 43

*Oregon Natural Res. Council Fund v. Forsgren*,
   252 F. Supp. 2d 1088 (D. Or. 2003) ............................................................... 21

*Public Employees for Environmental Responsibility v. U. S. Dept. of the Interior*,
   832 F. Supp. 2d at 29 ................................................................................ 17, 18

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989) ......................................................................................... 17

*Russell Country Sportsmen v. U.S. Forest Serv.*,
   668 F.3d 1037 (9th Cir. 2011) ......................................................................... 24

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011) ......................................................................... 16

*Sierra Club v. U.S. Army Corps of Eng'rs*,
   90 F. Supp. 2d 9 (D.D.C. 2013) ...................................................................... 38

*Southeast Conference v. Vilsack*,
   684 F. Supp. 2d 135 (D.D.C. 2010) ................................................................ 27

\* *State of New Mexico ex rel Bill Richardson v. BLM*,
   565 F.3d 683 (10th Cir. 2009) ............................................................... 23, 24, 37

*Texas v. United States*,
   787 F.3d 733 (5th Cir. 2015) ........................................................................... 41

\* *Theodore Roosevelt Cons. P'ship v. Salazar*,
   661 F.3d 66 (D.C. Cir. 2011) ..................................................................... 31, 33

*Theodore Roosevelt Cons. P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010) ..................................................................... 1, 32

\* *Winter v. Nat. Res. Def. Council, Inc.*,
   555 U.S. 7 (2008) ...................................................................................... 16, 38

*Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*,
   758 F.2d 669 (D.C. Cir.1985) (per curiam) .................................................... 38

\* *Wyoming v. U.S. Dept. of the Interior*,
   __ F.Supp.3d __, 2015 WL 5845145 (D. Wyo. Sept. 30, 2015) ....................... 41

*Yount v. Salazar*,
   2013 WL 93372 (D. Ariz. Jan. 8, 2013) .......................................................... 34

**Statutes**

5 U.S.C. § 702 ...................................................................................................... 38

5 U.S.C. § 705 ...................................................................................................... 45

5 U.S.C. § 706(2)(A) ................................................................................................ 16, 17

5 U.S.C. § 706(2)(D) ...................................................................................................... 45

16 U.S.C. § 1533(a)(1) ..................................................................................................... 1

16 U.S.C. § 1604(a) ................................................................................................... 27, 34

16 U.S.C. §1604(e)(1) ...................................................................................................... 1

42 U.S.C. § 4332(2)(C) .................................................................................................. 17

43 U.S.C. § 1701(a)(7) ..................................................................................................... 1

43 U.S.C. § 1702(a) ..................................................................................................... 9, 26

43 U.S.C. § 1702(c) ........................................................................................................ 32

43 U.S.C. § 1712(c)(9) ................................................................................................... 34

43 U.S.C. § 1732(b) ....................................................................................................... 33

**Federal Register**

46 Fed. Reg. 18,026 (March 23, 1981) ..................................................................... 22, 23

75 Fed. Reg. 13,910 (Mar. 23, 2010) .................................................................... 4, 5, 42

76 Fed. Reg. 77,008 (Dec. 9, 2011) ............................................................................ 5, 6

77 Fed. Reg. 21,162 (Apr. 9, 2012) ............................................................................. 34

80 Fed. Reg. 57,635 (Sept. 24, 2015) ..................................................................... 14, 40

80 Fed. Reg. 59,858 (Oct. 2, 2015) .............................................................. 3, 4, 14, 30

80 Fed. Reg. 63,583 (Oct. 20, 2015) ........................................................................... 22

**Other Authorities**

Idaho Code § 36-103(a) ................................................................................................ 39

**Regulations**

36 C.F.R. § 219.4(b)(2)(iv) ........................................................................................... 34

36 C.F.R. § 219.4(b)(3) ................................................................................................. 34

36 C.F.R. § 294.1 ........................................................................................................... 27

36 C.F.R. § 294.1(b) ...................................................................................................... 28

40 C.F.R. § 1502.1 ......................................................................................................... 17

40 C.F.R. § 1502.9(c)(1) ................................................................................................ 18

40 C.F.R. § 1502.9(c)(1)(i) ...................................................................................... 18, 24

43 C.F.R. § 1610.3-2(e) ...................................................................................... 14, 34, 37

43 C.F.R. § 1610.5-2 ...................................................................................................... 13

43 C.F.R. § 1610.7-2 ...................................................................................................... 26

43 C.F.R. § 1610.7-2(a) .......................................................................................................... 26

43 C.F.R. § 1610.7-2(b) .......................................................................................................... 27

## DECLARATION AND EXHIBIT LIST

| Exhibit Number | Description |
|---|---|
| Declaration of Thomas C. Perry with Exhibits 1-25, dated Oct. 23, 2015 | |
| 1 | Idaho Executive Order 2012-06, dated Feb. 1, 2012 |
| 2 | Idaho Executive Order 2015-04 with Appendices, dated May 27, 2015 |
| 3 | BLM Instruction Memorandum No. 2012-044, dated December 11, 2011; "National Greater Sage-Grouse Land Use Planning Strategy" |
| 4 | Relevant excerpts from BLM's "A Report on National Greater Sage-Grouse Conservation Measures" ("NTT Report"), dated December 11, 2011 |
| 5 | BLM Instruction Memorandum 2012-043, dated December 11, 2011; "Greater Sage-Grouse Interim Management Policies and Procedures" |
| 6 | Relevant excerpts from FWS's "Greater Sage-Grouse Conservation Objectives: Final Report" ("COT Report"), dated Mar. 22, 2013 |
| 7 | Relevant excerpts from the Idaho and Southwestern Montana Sub-Region Draft Land Use Plan Amendment and Environmental Impact Statement ("DEIS"), dated Oct. 2013 |
| 8 | State of Idaho Comments on the DEIS, dated Jan. 2014 |
| 9 | October 27, 2014 FWS Memorandum to Defendants Kornze and Tidwell titled, "Greater Sage-Grouse: Additional Recommendations to Define Land Use Allocations in Highly Important Landscapes" ("Ashe Memorandum") |
| 10 | Relevant excerpts from FWS's "Greater Sage-Grouse: Range-Wide Mitigation Framework, Version 1.0" ("FWS Mitigation Framework") |
| 11 | United States Geological Survey's "Conservation Buffer Distance Estimates for Greater Sage-Grouse—A Review: U.S. Geological Survey Open-File Report 2014-1239" ("USGS Lek Buffer Study"), dated November 2014 |

| | |
|---|---|
| 12 | Relevant excerpts from the Idaho and Southwestern Montana Sub-Region Greater Sage-Grouse Proposed Land Use Plan Amendment and Final Environmental Impact Statement ("Proposed Plan" or "FEIS"), dated May 2015 |
| 13 | Governor Otter's Protest of the Proposed Plan/FEIS, dated June 29, 2015 |
| 14 | Governor Otter's Consistency Review ("Governor's CR") of the Proposed Plan/FEIS, dated July 28, 2015 |
| 15 | BLM's Response ("BLM Response") to the Governor's CR, dated Aug. 6, 2015 |
| 16 | Governor Otter's Consistency Review Appeal ("Governor's Appeal") to BLM's Response, dated Sept. 8, 2015 |
| 17 | Defendant Kornze's denial ("Kornze Denial") of the Governor's Appeal, dated Sept. 16, 2015 |
| 18 | BLM's Protest Response to Governor Otter, dated Sept. 22, 2015 |
| 19 | Relevant excerpts from BLM's Record of Decision and Approved Resource Management Plan Amendments for the Great Basin Region, including the Greater Sage-Grouse Sub-Regions of Idaho and Southwestern Montana, Nevada and Northeastern California, Oregon and Utah ("BLM ROD"), dated Sept. 21, 2015 |
| 20 | Relevant excerpts from BLM's Idaho and Southwestern Montana Greater Sage-Grouse Approved Resource Management Plan Amendment; Attachment 1 to the BLM ROD ("BLM LUPA"), dated Sept. 21, 2015 |
| 21 | Relevant excerpts from the Forest Service's Greater Sage-Grouse Record of Decision: Idaho and Southwestern Montana, Nevada and Utah ("Forest Service ROD"), dated Sept. 16, 2015 |
| 22 | Relevant excerpts from the Forest Service's Idaho and Southwestern Montana Greater Sage-Grouse Plan Amendment; Attachment A to the Forest Service ROD ("Forest Service LUPA") |
| 23 | Relevant excerpts from the Western Association of Fish and Wildlife Agencies' |

| | |
|---|---|
| | "Greater Sage-Grouse Population Trends: An Analysis of Lek Count Databases 1965-2015, Western Association of Fish and Wildlife Agencies" ("2015 WAFWA Report"), dated Aug. 2015 |
| 24 | BLM Manual 1613—Areas of Critical Environmental Concern (Rel. 1-1541, 9/29/88) |
| 25 | Forest Service Manual 2300 – Recreation, Wilderness, and Related Resource Management (WO Amendment 2300-90-1, effective June 1, 1990) |
| Declaration of Governor C.L. "Butch" Otter with Exhibits 26-34, dated Oct. 22, 2015 | |
| 26 | Letter from Gov. Otter to Brian Kelly, FWS State Director, dated July 13, 2012; and Letter from Brian Kelly, FWS State Director, to Gov. Otter, dated Aug. 1, 2012 |
| 27 | Letter from Gov. Otter to Steve Ellis, BLM State Director, dated Aug. 2012; and Letter from Steve Ellis, BLM State Director, to Gov. Otter, dated Aug. 30, 2012 |
| 28 | Letter from Gov. Otter to Brian Kelly requesting FWS concurrence, FWS State Director, dated March 2013; and Concurrence Letter from Brian Kelly, FWS State Director, to Gov. Otter, dated April 2013, *see* Exhibit 2, App. 2 |
| 29 | Letter from Dustin Miller, OSC Administrator, to Steve Ellis, BLM State Director, dated July 2013 |
| 30 | Letter from Ken Salazar, Sec. of Interior, to Doc Hastings, U.S. Congress re: NTT Report (with outside science review), dated Dec. 2012 |
| 31 | Memorandum from Gov. Otter to Sally Jewell, Sec. of Interior, dated October 2013 |
| 32 | Internal Memorandum from Brian Kelly, FWS State Director, to Steve Ellis, BLM State Director re: Comments on the Administrative Draft of the DEIS, dated July 23, 2013 |
| 33 | FWS Comments on the DEIS, dated Jan. 2014 |
| 34 | Letter from Gov. Otter to Sally Jewell, Sec. of Interior, dated June 18, 2015 |

| | |
|---|---|
| Declaration of Dustin Miller, OSC Administrator, with Exhibits 35-37, dated Oct. 21, 2015 | |
| 35 | Internal Memorandum from Tim Murphy, BLM State Director, to Ed Roberson, BLM Washington Office re: Administrative Draft Proposed Plan , dated May 2014 |
| 36 | Internal BLM Document re: Greater Sage-Grouse Planning Issues for the BLM Planning Teams to Insert and Analyze in Administrative Draft Proposed Plan ("National Direction"), dated Jan. 30, 2015 |
| 37 | State of Idaho Comments on Administrative Draft Proposed Plan, dated May 2015 |
| Declaration of Thomas Schultz, Director of Department of Lands, with Exhibit 38, dated Oct. 21, 2015 | |
| 38 | Map of IDL Oil and Gas Leases with Focal Areas |
| Declaration of John Chatburn, Administrator of Office of Energy Resources, with Exhibit 39, dated Oct. 20, 2015 | |
| 39 | Map of 3.1 mile lek buffers and Focal Area |
| Declaration of Scott Bedke, Speaker of the House, dated Oct. 21, 2015 | |
| Declaration of Virgil Moore, Director Department of Fish and Game, dated Oct. 9, 2015 | |
| Declaration of Celia Gould, Director Department of Agriculture, dated Oct. 20, 2015 | |
| Declaration of Noy E. Brackett III, Idaho State Senate, dated Oct. 2015 | |

Plaintiffs C.L. "Butch" Otter, in his official capacity as Governor of the State of Idaho, ("Governor Otter") and the Idaho State Legislature (collectively, "Plaintiffs") submit the following points and authorities in support of their motion for a preliminary injunction to set aside and enjoin implementation of the Great Basin Record of Decision ("ROD") and the Approved Land Management Plan Amendments for the Idaho and Southwestern Montana Sub-Region ("Idaho LUPA").[1]

## INTRODUCTION

The Bureau of Land Management ("BLM") and United States Forest Service ("Forest Service") together manage a significant portion of the land in the State of Idaho ("the State" or "Idaho"), with over 60% of the State under federal management.  Both agencies are charged by their organic statutes to manage public lands for multiple use and sustained yield, a standard that requires the balancing of competing uses to optimally manage federal lands.  *See Theodore Roosevelt Cons. P'ship v. Salazar*, 616 F.3d 497, 504 (D.C. Cir. 2010); 43 U.S.C. § 1701(a)(7); 16 U.S.C. §1604(e)(1).  Last month, Defendants adopted amendments to land use plans for federal lands across 10 states, including Idaho, imposing new regulatory mechanisms intended to prevent listing the Greater Sage-grouse ("sage-grouse") under the Endangered Species Act ("ESA").  *See* 16 U.S.C. § 1533(a)(1).

In attempting to avert an ESA listing and fulfill directives set by U.S. Fish and Wildlife Service ("FWS"), Defendants lost sight of their multiple-use mandate as well as procedural requirements under the National Environmental Policy Act, 43 U.S.C. §§1701, *et seq.* ("NEPA") and the Federal Land Policy Management Act, 42 U.S.C. §§4321, *et seq.*  ("FLPMA"). BLM and the Forest Service also let a FWS settlement deadline dictate their own process, leading to a number of violations of federal law when they made a late and significant change in direction

---

[1] On September 22, 2015, the Bureau of Land Management and U.S. Forest Service released separate Records of Decision ("ROD") for the Great Basin Region.  *See* Declaration of Thomas C. Perry ("Perry Decl."), Ex. 19, 21 (collectively, "ROD" unless specifically referencing the "BLM ROD" or "Forest Service ROD").  Attached to those RODs are the agencies' approved resource management plan amendments for the Idaho and Southwestern Montana Sub-Region.  *See* Perry Decl. Ex. 20, 22 (collectively, "Idaho LUPA" unless specifically referencing to the "BLM LUPA" or the "Forest Service LUPA").

that jettisoned a three year cooperative state-federal planning process.  The resulting violations are so blatant, and the impacts of these improper agency actions are so sweeping, that a preliminary injunction should be issued until this Court rules on the merits of Plaintiffs' claims.

After the close of public comment on Defendants' draft environmental impact statement ("DEIS"),[2] FWS issued new policy directions resulting in three substantial and previously undisclosed  management measures in the Final Environmental Impact Statement ("FEIS"),[3] ROD and Idaho LUPA:  1) a "net conservation gain" mitigation standard for all land use activities in all sage-grouse habitat, regardless of the conservation value of that habitat; 2) designation of 3.8 million acres in Idaho and Montana as "Sagebrush Focal Areas" subject to "the most restrictive measures" in the Idaho LUPAs; and 3)  uniform buffers for all permitted activities, generally set at a default distance of 3.1 miles, around all sage-grouse mating grounds, or leks, across all habitat zones.

While Defendants made a number of last-minute changes, details of which this Court will be asked to review over the course of this litigation, Plaintiffs' motion focuses on these three crucial measures.  Defendants violated NEPA when they failed to prepare a Supplemental Environmental Impact Statement ("SEIS") on this drastically different final action.  By elevating sage-grouse conservation  above all other uses of federal lands, Defendants also violated the multiple use mandates of FLPMA and the National Forest Management Act of 1976 ("NFMA"), 16 U.S.C. § 1604, and  the procedural safeguards of both statutes.

Plaintiffs' injuries are real and on-going.  By failing to meet FLMPA's requirement to manage federal lands consistently with state plans, Defendants infringed on Plaintiffs' sovereign authority as the Governor and Legislature of Idaho.  Implementation of the ROD is disrupting the management of Idaho's state trust lands, and planning for the infrastructure needed for reliable

---

[2] Idaho and Southwestern Montana Sub-Regional Greater Sage-Grouse Draft Land Use Plan Amendment and Environmental Impact Statement (Oct. 2013) ("DEIS"). Perry Decl. Ex. 7 provides the relevant excerpts of the DEIS.

[3] Idaho and Southwestern Montana Sub-Regional Proposed Land Use Plan Amendment and Final Environmental Impact Statement (May 2015) ("FEIS" or "Proposed Plan").  Perry Decl. Ex. 12 provides the relevant excerpts of the FEIS.

and safe electric power, as well as diminishing resources directed toward reducing rangeland wildfires and invasive vegetative species, the primary threats to sage-grouse in Idaho.

The balance of harms favors a preliminary injunction. Sage-grouse would not be harmed by an injunction: Idaho will still proceed with implementing its sage-grouse plan, as directed by Idaho Executive Order 2015-04, on state and private lands. Plaintiffs would agree to implementation of the Idaho plan on federal lands as an interim measure while this suit is pending – a step the prior Interior Secretary offered at the beginning of this planning process. In any event, sage-grouse numbers have increased in recent years and there is no biological urgency to Defendants' actions, which met an arbitrary litigation deadline. A preliminary injunction also would recognize important public policy interests in federal and state cooperation in the management of federal lands.

## BACKGROUND

### A.  Factual Background

Sage-grouse are birds in the *Phasianidae* family, which includes over 50 genera including turkeys, pheasants and partridges. 80 Fed. Reg. 59,858, 59,860 (Oct. 2, 2015) ("2015 Finding"). Prior to European settlement of western North America, sage-grouse occurred in an approximately 460,000 square mile area that today comprises 13 states and 3 Canadian provinces. *Id.* at 59,864. Currently a minimum breeding sage-grouse population of approximately 424,645 birds occurs in 11 states and 2 provinces, with 98% of the population located in the United States. *See* Western Association of Fish and Wildlife Agencies', "Greater Sage-Grouse Population Trends: An Analysis of Lek Count Databases 1965-2015 (Aug. 2015) ("2015 WAFWA Report")) [4]. Sage-grouse are found in approximately 15 million acres of state and federal lands in the State of Idaho. *See* Idaho Executive Order 2014-04, App. 1 at 2 (hereinafter "Governor's Plan").[5]

---

[4] Perry Decl. Ex. 23 provides the relevant excerpts of the 2015 WAFWA Report; s*ee also* Declaration of Virgil Moore ("Moore Decl.") ¶¶29-31 (discussing the recent population increase).
[5] Perry Decl. Ex. 2 provides the Governor's Plan (E.O. 2015-04), including appendices, in its entirety.

Sage-grouse depend on a variety of shrub-steppe habitats throughout their life cycle and sage-grouse distribution is strongly correlated with the distribution of sagebrush.  80 Fed. Reg. at 59,865-66.  Sagebrush is the most widespread vegetation in the intermountain lowlands in the western states.  *Id.* at 59,866.  The majority of sage-grouse occupied habitat is on federal lands with approximately 5% occurring on state lands.  *Id.*

Sage-grouse rely on sagebrush areas for nesting, food and cover.  *Id.* at 59,866-67.  During the breeding season, male sage-grouse gather together to perform courtship displays on leks.  *Id.* at 59,866.  Leks are relatively open sites such as areas of bare soil, shortgrass-steppe, windswept ridges or exposed knolls.  *Id.*  Leks can be formed opportunistically at any appropriate site within or adjacent to nesting habitat, and FWS does not consider lek habitat availability be a limiting factor for sage-grouse.  *Id.*

Estimating population sizes of sage-grouse is difficult due to the species' large range, incomplete sampling and challenges in counting females; consequently, population size is estimated based on counts of males on leks during the breeding season.  *Id.* at 59,868.  Sage-grouse populations increase and decrease over time, making assessments of population size and short term trends difficult.  *Id.*; *see also* Moore Decl. ¶30.  According to FWS, long term population trends show a "small, but detectable decline since the 1960s."  80 Fed. Reg. at 59,871.  Idaho's sage-grouse population trend showed a significant decline between the early 1970s to the mid-1990s, likely reflecting large-scale land development and wildfire.  Moore Decl. at ¶30.  The rate of decline began to minimize in the late 1990s, and Idaho's recent statewide population trend has been relatively stable, and is up 13 percent since 2013.  *Id.* at ¶31.

FWS has responsibility for determining whether land-based species such as sage-grouse meet the criteria for listing under the ESA.  From 1999 to 2005, FWS received 8 petitions to list the sage-grouse.  80 Fed. Reg. at 59,859, Table 1.  In 2010, FWS found that listing rangewide was warranted, but precluded by other higher priority actions.  75 Fed. Reg. 13,910 (Mar. 23, 2010) ("2010 Finding").  The 2010 Finding was based on continuing population declines with some local extirpations resulting from habitat fragmentation.  *Id.* at 13,922.  Of the five listing

factors in section 4(a)(1) of the ESA,  FWS found that present or threatened destruction,

modification or curtailment of sage-grouse habitat and the inadequacy of existing regulatory

mechanisms posed a significant threat to the species.  *Id.* at 13,983.  FWS identified a number of

specific threats to sage-grouse in the Great Basin region; primarily impacts from wildfires and

invasive plant species, and to some degree habitat fragmentation due to large-scale infrastructure

development.  Moore Decl. ¶14, 18; *see also* 75 Fed. Reg. at 13,933.

As BLM and the Forest Service manage close to 60% of the species' habitat, FWS

identified conservation measures in BLM's resource management plans ("RMPs") and the Forest

Service's Resource Management Plans ("LMPs") as the primary regulatory mechanisms "to

assure adequate conservation of the greater sage-grouse and its habitat on public lands."  76 Fed.

Reg. 77,008, 77,009 (Dec. 9, 2011); *see also* BLM ROD at 1-7.[6]

Idaho has invested considerable resources over the past two decades in developing and

implementing cooperative sage-grouse plans, adopting its first management plan in 1997.  Moore

Decl. ¶¶8-10.  From 2001 to the present, the Idaho Department of Fish and Game ("IDFG") has

invested an average of approximately one million dollars per year of federal and state funds on

sage-grouse monitoring, public involvement, and conservation actions.  *Id.* at ¶8.

## B.  Procedural History

### 1.  *Coordinated State and Federal planning for sage-grouse conservation from 2011-2014.*

Defendants began the process of amending their land use plans in reaction to the 2010

Finding and in the face of still more litigation seeking to list sage-grouse under the ESA.  FWS

entered into a judicially-supervised settlement agreement that required a listing decision on 250

species, including sage-grouse, no later than September 30, 2015.  *See In Re Endangered Species

Act Section 4 Deadline Litigation*, 10-mc-00377-EGS, MDL Dkt No. 2165 (D.D.C. Sept. 9,

2011).  BLM and the Forest Service stated that "in view of the identified threats to the greater

sage-grouse, and the FWS timeline for making a listing decision on this species," the two

---

[6] Perry Decl. Ex. 19 provides the relevant excerpts of the BLM ROD.

agencies proposed to incorporate sage-grouse conservation measures into relevant RMPs and LMPs by September 2014 in order to avoid a potential ESA listing through their plan amendment and revision processes.  76 Fed. Reg. at 77,009.

BLM acted as the lead agency for NEPA purposes and divided the 11 states into two regions for planning purposes.  BLM- and Forest Service-managed lands in Idaho, along with those in California, Nevada, Oregon, and portions of Utah and Montana were assigned to the Great Basin Region. *See* FEIS 1-3.  The two regions were further divided into 15 sub-regions for purposes of NEPA analysis and land use planning amendments. FEIS 1-3.  In late 2011, BLM and the Forest Service issued a scoping notice for preparation of  federal environmental impact statements, pledging that "State Game and Fish agencies' greater sage-grouse data and expertise will be utilized to the fullest extent practicable in making management determinations on Federal lands."  76 Fed. Reg. 77,008, 77,011 (Dec. 9, 2011).

BLM had established a National Technical Team ("NTT") to serve as a "scientific and technical forum" to assist in the land use planning process.[7]  *See* BLM, "A Report on National Greater Sage-Grouse Conservation Measures," ("NTT Report"), dated Dec. 21, 2011 at 4.  In December 2011, the NTT released their final report.  The NTT recommended managing priority sage-grouse habitats so that discrete anthropogenic disturbances cover less than 3% of total sage-grouse habitat regardless of ownership. NTT Report at 8-9.  An outside review was highly critical of the science used in the report, finding it grossly oversimplified because it ignores seasonal differences in how sage grouse use the landscape.  *See* Letter from Sec. of Interior Salazar to Rep. Doc Hastings (outside review comments attached) ("Salazar Letter"), Otter Decl. ¶25 & Ex. 30.  The outside reviewers objected that the document "suffers from a 1-size fits all approach that lacks context.  Lumping all sage grouse seasonal habitats in all locations across the range regardless of population size or relative importance of the population [into two zones]" was "tremendously over simplistic." *See* Salazar Letter at 6, 9.

---

[7] Perry Decl. Ex. 4 provides the relevant excerpts of the NTT Report.

In December 2011, then Secretary of the Interior Ken Salazar invited Idaho and the other ten affected western states to submit state-based conservation plans. Otter Decl. ¶14. The western governors, including Governor Otter, and the Director of BLM then created a Sage-Grouse Task Force to advance a range-wide effort to conserve sage-grouse. Moore Decl. ¶17.

On March 22, 2013, FWS released a peer-reviewed report that provided conservation advice to BLM and the Forest Service. The report emphasized the importance of state-based plans and continuing collaboration and recognized state wildlife agencies' management expertise and authority for sage-grouse. *See* FWS, Greater Sage-Grouse (*Centrocercus urophasianus*) Conservation Objectives: Final Report (2013) ("COT Report")).[8] The COT Report identified a need for flexibility in order to meet the needs of sage-grouse and local ecological and socioeconomic conditions. *See generally* COT Report Cover Letter; COT Report at 31. The COT Report also identified specific Priority Areas of Conservation ("PACs"), described as key habitat essential for sage-grouse conservation. COT Report at 14; Cover Letter.

Federal land use decisions can have a profound impact on Idaho's economy, custom, culture and way of life. Otter Decl. ¶¶15-16; *see also* Declaration of Scott Bedke ("Bedke Decl.") ¶4. Accordingly, working with the Idaho Legislature and his own Task Force, Governor Otter prepared a conservation plan for inclusion in the federal process. *See generally* Governor's Plan; *see also* Idaho Executive Order 2012-02, Perry Decl. Ex. 1. The Governor's Plan addressed the primary identified threats to sage-grouse in Idaho: wildfire, invasive species, and habitat fragmentation caused by infrastructure development, as well as secondary identified threats such as improper livestock grazing practices. The Governor's Plan distinguished individual habitat zones by analyzing the breeding bird density and the particular threats in an area to determine their conservation value. Moore Decl. ¶18.

The Governor's Plan allocated sage-grouse habitat in Idaho into three tiers subject to tailored conservation measures: Core Habitat Zone ("CHZ"); Important Habitat Zone ("IHZ");

---

[8] Perry Decl. Ex. 6 provides the relevant excerpts of the COT Report.

and General Habitat Zone ("GHZ"), with the highest level of protections in the CHZ and most flexible land uses in the GHZ. Approximately 95% of Idaho's known sage-grouse population is encompassed by the CHZ and IHZ zones. The GHZ includes few active leks and fragmented or marginal habitat, as well as habitat for two isolated populations. *See* Otter Decl. ¶21; DEIS at 2-78.

FWS responded favorably to the Governor's Plan in initial reviews in 2013. FWS stated it was "supportive of the science-based adaptive conservation strategy" in the plan "for Idaho-specific needs" and praised the foundation of the Plan "and most of the specific elements that complete it" as "solid and grounded in scientific concepts and approach important to both the Service and the Department of the Interior." *See* Governor's Plan at App. 2; Concurrence Letter from FWS to Governor Otter, dated Apr. 10, 2013. As a cooperating agency, FWS provided comments on an administrative draft of the DEIS, and concluded that "[t]he State of Idaho developed alternative (Alternative E), is currently the only alternative that substantively addresses these topics. Although we fully realize that Alternative E will require further effort to bring it to full development, currently, it most closely meets the goals and objectives of the COT." FWS Comments on Administrative Draft of Idaho DEIS at 2, dated July 23, 2013, Otter Decl. ¶ 27 and Ex. 32. The Governor's Plan was revised to respond to comments from BLM and FWS. Letter from OSC Administrator Miller to BLM State Director Ellis, Otter Decl. ¶26 and Ex. 29; *see also* Moore Decl. ¶ 19.

### 2. *Release of the Draft EIS in 2013.*

In October 2013, Defendants released the DEIS, adopting the Governor's Plan as a co-preferred alternative. The DEIS analyzed four alternatives in addition to Alternative A, the required "no action" alternative.[9]

---

[9] The DEIS also considered but eliminated several alternatives from further analysis because: (1) they would not fulfill the requirements of FLPMA or NFMA or other existing laws or regulations, (2) they did not meet the purpose and need for the LUPA, (3) they were already part of an existing plan, policy, or administrative function, or (4) they did not fall within the limits of the planning criteria; or they were outside of the technical, legal, or policy constraints of developing a LUPA for BLM- and Forest-Service-administered land resources and resource uses. DEIS 2-17.

Alternative B ("NTT Alternative") divided sage-grouse habitat into a two-tier system (i.e., preliminary priority habitat and general habitat) with conservation measures focusing on the priority habitat areas.  The NTT Alternative adopted the stringent management recommendations of the NTT Report for the priority areas.  DEIS 2-62-64.  Alternative C ("ENGO Alternative I") was proposed by conservation groups and considered all occupied habitat as priority areas. ENGO Alternative I limited commodity development in areas of occupied habitat and closed or excluded large portions of the planning area to many land uses.  DEIS 2-16.  It also nominated several new Areas of Critical Environmental Concern ("ACECs") on BLM-managed lands.[10] DEIS 2-65.

Alternative D was identified as a co- preferred alternative along with Alternative E, the Governor' Plan.  Alternative D modified the NTT Report to balance "resources and resource uses among competing human interests, land uses, and the conservation of natural and cultural resource values."  DEIS at ES-15.  Alternative D would have created three management areas with greater restrictions in the most important and relatively intact habitat, and less restrictions in habitat areas of the least quality.  The BLM and Forest Service would require no net unmitigated loss of the highest value habitat zone instead of a disturbance cap.  *Id.*  Alternative D recommended 0.6 mile "no surface occupancy" ("NSO") buffer around occupied leks for fluid mineral development, and a 3 mile lek buffer for salable minerals in priority areas.   DEIS 2-35, 36 and 37.

Alternative E was the Governor's Plan with its three-tier management system.  DEIS at 2-16.  Alternative E proposed an "in-lieu fee" mitigation program in which a project developer would pay funds into an account managed by the mitigation program for performance of mitigation actions that provided measurable benefits for sage-grouse and its habitat.  Idaho DEIS 2-81.  Alternative E proposed 0.6 mile lek buffers in Priority Habitat only for fluid mineral

---

[10] An ACEC is an area on BLM-administered lands "where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and to ensure safety from natural hazards."  43 U.S.C. § 1702(a).  *See* section III.B.1 *infra.*

development.  DEIS 2-36.  Neither co-preferred alternative nominated any new ACEC or Zoological Area designations.

Alternative F ("ENGO Alternative II") was also proposed by conservation groups and contained a mixture of management actions as or more restrictive than the NTT Report, including consideration of  widespread nomination of ACECs as well as Zoological Areas on Forest Service lands.[11]  DEIS at ES-16.

BLM received 1,348 unique letters with more than 4,990 substantive comments on all of the draft Great Basin documents.  BLM ROD "Dear Reader" letter at 1.  Governor Otter timely filed comments on the Idaho DEIS.  Otter Decl. ¶28.

State and Federal staff, with the input of the Governor's Task Force, began working at the regional level to reconcile the two co-preferred alternatives into one cohesive approach.  On May 28, 2014, Idaho BLM State Director Murphy wrote to the BLM Assistant Director for Resources and Planning that this had been accomplished.  *See* Letter from BLM Director Tim Murphy, Miller Decl. ¶22 and Ex. 35.  This combination of the Governor's Plan and Alternative D was designated "Alternative G2" and was the State Directors' recommended Proposed Plan. *See* Miller Decl. ¶22-23; Moore Decl. ¶22.

### 3.  *Post-DEIS Federal abandonment of Idaho's cooperative process in 2014.*

In the autumn of 2014, after the close of public comment on the  DEIS and before issuance of the FEIS, Defendants abruptly changed internal direction based on three post-DEIS documents, abandoning the state-specific conservation objectives of the COT Report in favor of a "one size fits all" approach to all areas of sage-grouse habitat across all of the western states.

*First*, in September 2014, FWS released *Greater Sage-Grouse Range-wide Mitigation Framework: Version 1.0* (the "FWS Mitigation Framework") outlining four new goals, principles and standards to "increase [the] likelihood of contributing to successful sage-grouse

---

[11] "Zoological Areas" are Forest Service recreational areas that include "animal specimens, animal groups, or animal communities that are significant because of their occurrence, habitat, location, life history, ecology, rarity, or other features."  *See* Forest Service Manual 2300 at 2372.05.  Forest Service Manual 2300 is provided in the Perry Decl. Ex. 25.  *See* section III.B.2, *infra*.

conservation." FWS Mitigation Framework at 4, Perry Decl. Ex. 10  The FWS Mitigation

Framework establishes a mitigation goal of "achiev[ing] net positive conservation" and advises

without any analysis that "[p]rograms that are structured with a goal of only no net loss will be

evaluated more conservatively by the Service because they are unlikely to positively influence

the conservation status of the species." *Id.* at 4.  The document defines "net conservation gain"

as "the actual benefit or gain above baseline conditions, after deductions for impacts, in habitat

function or value to species covered by a mitigation program." *Id.* at 22.

*Second*, on October 27, 2014, FWS Director Dan Ashe sent BLM and the Forest Service

a memorandum titled: "Greater Sage-Grouse: Additional Recommendations to Refine Land Use

Allocation in Highly Important Landscapes" (the "Ashe Memorandum").  Perry Decl. Ex. 9

provides the Ashe Memorandum.  This memorandum was marked "Pre-Decisional.  For Internal

Review Purposes Only" and was never released for public review and comment.  Maps in the

Ashe Memorandum identified a 16.5 million acre subset of previously-identified Priority Habitat

Management Areas ("PHMAs").  Director Ashe stated that this subset "represent[s] recognized

'strongholds' for the species that have been noted and referenced by the conservation community

as having the highest densities of the species and other criteria important for the persistence of

the species." Ashe Memorandum at 1.  FWS recommended that this subset of habitat be subject

to "the strongest level of protection" and "the most conservative approach." *Id*.  FWS did not

consult or coordinate with Idaho Fish and Game in the preparation of the Idaho maps. *See*

Moore Decl. ¶23; Otter Decl. ¶4.

*Third*, on November 21, 2014, the United States Geological Survey published a review

titled "Conservation Buffer Distance Estimates for Greater Sage-Grouse – A Review" (the

"USGS Lek Buffer Study").  Perry Decl. Ex. 11.  The study recommended applying uniform lek

buffer distances for all permitted activities, with a recommended default distance of 3.1 miles, in

all habitat zones across the entire multi-state planning are, regardless of the value of such habitat.

### 4. *Release of the FEIS and Proposed Plan in 2015.*

Defendants released the FEIS and their proposed LUPAs ("Proposed Plan") in May, 2015. FEIS. The Proposed Plan contained three new key elements based on the three post-DEIS policy documents. These elements were not part of the alternatives analyzed in the DEIS. FEIS 2-2 – 2-4.

*First*, the Proposed Plan requires "net conservation gain" mitigation in authorizing third-party actions that result in habitat loss and degradation. FEIS 2-4. This completely new standard is not defined in the FEIS. BLM stated that this standard "is consistent with" the FWS Mitigation Framework. BLM ROD at 1-25. The concept of "net conservation gain" is not discussed anywhere in the DEIS or proposed as a standard by any of the alternatives. The "no net unmitigated loss" management standard in the DEIS was dropped from the FEIS.

*Second*, the Proposed Plan adopted the Ashe Memorandum by creating SFAs, a fourth land use zone encompassing approximately 11 million of acres across all ten states. FEIS at 2-2 ("these areas have been identified in the Proposed Plan based on recommendations in a USFWS memorandum"). BLM describes SFAs as the "most restrictive allocations" which establish "requirements to avoid and minimize additional disturbance." BLM ROD at 1-20. The management prescriptions for SFAs: 1) NSO without waiver, modification or exception for fluid mineral development; 2) recommend withdrawal from mineral entry under the Mining Law of 1872, subject to valid existing rights; and 3) prioritize livestock grazing in these areas for permit renewal with additional management and conservation actions. FEIS at 2-2; 2-27. No DEIS alternative analyzed a fourth habitat zone subject to these stringent measures.

*Third*, the Proposed Plan adopted the buffers of the USGS Lek Buffer Study, including setting uniform lek buffer distances for all permitted activities, with a default 3.1 mile buffer distance in all habitat zones across the entire multi-state planning area. Defendants admit that "the buffer report was not available at the time of the DEIS release." FEIS at 2-3. In contrast, Alternatives D and E in the DEIS recommended a 0.6 mile lek buffer in Priority Habitat primarily for fluid mineral development, but neither proposed uniform buffer distances for all

activities across all habitat zones.

These changes, together and separately, are a substantial departure from the DEIS alternatives, affect different amounts of acreage in different geographic areas, and were adopted without consulting with Plaintiffs or adequately informing the public. *See generally* Governor Otter's Consistency Review ("Governor's CR"), Perry Decl. Ex. 14; FEIS Appendix EE, Comparison between Proposed Plan and Co-Preferred Alternatives. Not only did these last-minute changes substantively depart from the Governor's Plan and the DEIS, but the timing of the Defendants' about-face curtailed Plaintiffs' statutory right to reconciliation with local plans to the maximum extent practicable and a reasonable balance between state and federal interests.

### 5. *Protest and Consistency Review process and final action in 2015.*

BLM's planning regulations allow any person who participated in a planning process with an interest that may be adversely affected by a BLM decision to protest that decision. 43 C.F.R. § 1610.5-2. For purposes of this planning effort, the Forest Service adopted BLM's planning regulations. The agencies received 19 timely and valid protests of the Proposed Plan and FEIS, including a protest from Governor Otter. BLM ROD at 2-12; *see* Governor Otter's Protest, Perry Decl. Ex. 13; Otter Decl. ¶ 39. Governor Otter specifically requested the preparation of an SEIS because of the new and unanalyzed measures in the Proposed Plan. Governor's Protest at 5. BLM made no changes to its decision in response to the Governor's protest, nor did it prepare an SEIS.

Exercising his rights under FLPMA § 202(c)(9), Governor Otter then filed an 85-page Consistency Review with the agencies on July 28, 2015. *See* Otter Decl. ¶ 40. The review analyzed the discrepancies between the Proposed Plan and the Governor's Plan in detail, and recommended measures to reconcile the two. BLM provided a 12-page cursory response in less than six business days on August 6, 2015. *See* Otter Decl. ¶41; BLM Response to Governor's CR, Perry Decl. Ex. 15. BLM did not adopt the Governor's recommendations for resolving inconsistencies nor circulated those recommendations for public comment. Otter Decl. ¶41-42.

For the first time, BLM made a blanket assertion that the Governor's Plan was inconsistent with Federal law and policies.  BLM Response at 3.

Governor Otter next filed an appeal under 43 C.F.R. § 1610.3-2(e) on September 8, 2015, and received another cursory response on September 22, 2015, after Defendants had already executed the RODs.[12]  Otter Decl. ¶ 43-44; Governor's Appeal, Perry Decl. Ex. 16.  Defendants again insisted that the Governor's Plan was generally inconsistent with federal law and policies and made no meaningful changes to the action.  Otter Decl. ¶45; Kornze's Denial, Perry Decl. Ex. 17.

Defendants signed RODs adopting the Proposed Plan without any material modification on September 16 and 21, 2015.  *See* Forest Service ROD at 73;[13] and BLM ROD at 6-1.  BLM published its recommended mineral withdrawal under section 204 of FLPMA, along with a scoping notice to determine relevant issues for a new EIS on the environmental impacts of the withdrawal.  80 Fed. Reg. 57,635 (Sept. 24, 2015).  FWS then published its decision not to list greater sage-grouse under the ESA.  2015 Finding, 80 Fed. Reg. 59,858 (Oct. 2, 2015).

## ARGUMENT

### I.   PLAINTIFFS HAVE STANDING

Because NEPA, NFMA and FLPMA do not create private rights of action, Plaintiffs rely on the Administrative Procedure Act, 5 U.S.C. §§ 701-706 ("APA") in bringing their claims. Complaint (Dkt. 1) ¶¶27-28.  To bring a challenge under the APA, a plaintiff must satisfy Article III standing requirements as well as the "zone of interests" test.  *See Bennett v. Spear*, 520 U.S. 154, 163 (1997).  There are three elements to Article III standing: (1) injury-in-fact, (2) causation, and (3) redressability.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). Here, Plaintiffs assert procedural claims under all three statutes, for which the second and third standing elements are relaxed.  "When a litigant is vested with a procedural right, that litigant has

---

[12] The BLM ROD erroneously records the Governor receiving Defendant Kornze's denial prior to the execution of the RODs.  BLM ROD at 2-16; *cf.* Otter Decl. ¶44.
[13] Perry Decl. 21 provides the relevant excerpts to the Forest Service ROD.

standing if there is some possibility that the requested relief will prompt the injury-causing party to reconsider the decision that allegedly harmed the litigant." *Massachusetts v. EPA*, 549 U.S. 497, 518 (2007).

The U.S. Supreme Court has explained that in applying the zone of interest test for APA claims, the court must look to the purposes of the substantive provisions of the statute under which the plaintiff is suing. *Bennett*, 520 U.S. at 175. The Supreme Court's recent decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.,* 134 S. Ct. 1377, 1387 (2014), has further clarified that, rather than prudential standing, the zone-of-interest test is a matter of statutory interpretation asking "whether this particular class of persons ha[s] a right to sue under this substantive statute." *Id.* (internal quotations and citations omitted). *Lexmark* directs courts to "determine the meaning of the congressionally enacted provision creating a cause of action." *Id.* at 1388.

Where a party's standing is self-evident, it need not submit additional evidence to support its standing allegations. In *Fund for Animals v. Norton*, 322 F. 3d 728, 734 & n.5 (D.C. Cir. 2003), the D.C. Circuit held the Mongolian government had standing to intervene in a suit challenging the ESA listing of central Asian argali sheep as threatened. Mongolia's standing was "self-evident" because fees paid by sport hunters would cease if the plaintiffs prevailed. *Id.* at 734. Plaintiffs' standing is likewise self-evident. Idaho has responsibility for managing sage-grouse within its borders. It developed a sage-grouse plan for Defendants' consideration, in response to their specific invitation, which became an alternative in the NEPA process. States and state governors have a unique role in FLPMA and NFMA processes. Nevertheless, Plaintiffs have documented the grounds for their standing in this matter. *See generally* Otter Decl.; Bedke Decl.; Moore Decl.; Schultz Decl.; Miller Decl.; Chatburn Decl.; Gould Decl.

"Well before the creation of the modern administrative state, we recognize[d] that States are not normal litigants for the purposes of invoking federal jurisdiction." *Massachusetts*, 549 U.S. at 537 (citing *Georgia v. Tenn. Copper Co.*, 206 U.S. 230, 237 (1907) for the proposition that states have a stake in protecting their quasi-sovereign interests, and that interest is

"independent of and behind the titles of its citizens, in all the earth and air within its domain.")
Plaintiffs are entitled to the "special solicitude" contemplated by *Massachusetts* and have
standing to bring these claims.

## II.    LEGAL STANDARDS

A plaintiff seeking a preliminary injunction must establish that 1) he is likely to succeed
on the merits; 2) he is likely to suffer irreparable harm in the absence of preliminary relief; 3) the
balance of equities tips in his favor; and 4) an injunction is in the public interest. *Sherley v.
Sebelius*, 644 F.3d 388, 392 (D.C. Cir. 2011) (quoting *Winter v. Nat. Res. Def. Council, Inc.,* 555
U.S. 7, 20 (2008)). While emphasizing the importance of the "irreparable harm" factor, the D.C.
Circuit applies a "sliding-scale approach" in evaluating the preliminary injunction factors. *See,
e.g., Sherley*, 644 F.3d at 392-93. Under this approach, the various factors are balanced against
each other such that "[i]f the movant makes an unusually strong showing on one of the factors,
then it does not necessarily have to make as strong a showing on another factor." *Davis v.
Pension Benefit Guar. Corp.*, 571 F.3d 1288, 1291-92 (D.C. Cir. 2009); *see also Mott
Thoroughbred Stables, Inc. v. Rodriguez*, 87 F. Supp. 3d 237, 243 n.7 (D.D.C. 2015).

The APA directs that final agency actions shall be held unlawful and set aside where
found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with
law." 5 U.S.C. § 706(2)(A). In making this determination, the court considers "whether the
agency acted within the scope of its legal authority, whether the agency has explained its
decision, whether the facts on which the agency purports to have relied have some basis in the
record, and whether the agency considered the relevant factors." *Back Country Horsemen of
America v. Johanns*, 424 F. Supp. 2d 89, 93 (D.D.C. 2006) (quoting *Fund for Animals v.
Babbitt*, 903 F. Supp. 96, 105 (D.D.C. 1995)).

Courts review an agency's failure to produce an SEIS under the arbitrary and
capricious standard, only giving deference to the agency's technical expertise when technical
questions are at issue. *Chem. Weapons Working Group v. U.S. Dep't of Defense*, 655 F. Supp.

2d 18, 35 (D.D.C. 2009); *see* 5 U.S.C. § 706(2)(A).  A court's role is to determine whether the agency took a "hard look" at the potential environmental concern and, if so, whether the agency's determination met the arbitrary and capricious standard.  *Public Employees for Environmental Responsibility v. U. S. Dept. of the Interior*, 832 F. Supp. 2d at 29.  "[I]n the context of reviewing a decision not to supplement an EIS, courts should not automatically defer to the agency's express reliance on an interest in finality without carefully reviewing the record and satisfying themselves that the agency has made a reasoned decision based on its evaluation of the significance-or lack of significance-of the new information." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 378 (1989); *see City of Olmsted Falls v. F.A.A.*, 292 F.3d 261, 269 (D.C. Cir. 2002) (quoting *City of Grapevine, Tex. v. DOT*, 17 F.3d 1502, 1503-04 (D.C. Cir. 1994)).

### III.   PLAINTIFFS' CLAIMS ARE LIKELY TO SUCCEED ON THE MERITS

#### A. Defendants violated NEPA by failing to prepare a Supplemental Environmental Impact Statement.

Plaintiffs are likely to prevail on at least one of their claims under NEPA.  NEPA requires federal agencies to prepare an EIS whenever a proposed government action qualifies as a "major Federal action significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  The primary purpose of an EIS is "to serve as an action-forcing device . . . ."  40 C.F.R. § 1502.1; *see also Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349 (1989); *Citizens Against Rails–to–Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir. 2001).

Defendants were required to prepare a supplemental environmental impact statement ("SEIS") with a new public comment period but have not done so.[14]  Defendants went through the motions of a complex and lengthy NEPA process, but at the eleventh hour failed to

---

[14] Defendants failed to take the required "hard look" at the impacts of the Great Basin ROD, including failing to adequately analyze the cumulative impacts of the Great Basin ROD in accordance with 40 C.F.R. § 1502.25(a)(2). Complaint at ¶¶ 97-99.  Plaintiffs do not waive this issue, but need only show for purposes of preliminary injunctive relief that they are likely to prevail on the merits of at least one cause of action.  *See FBME Bank Ltd. v. Lew*, --- F. Supp. 3d---, 2015 WL 5081209, *2 (D.D.C. Aug. 27, 2015).

comply with their most basic obligations under NEPA.  Despite unsupported assertions to the contrary in the FEIS, adoption of the net conservation gain mitigation standard, uniform and default lek buffers and widespread SFAs create significant environmental effects that were not analyzed in the  DEIS.  As well as preparation of an SEIS, NEPA required a further "hard look" by the agencies at the environmental impacts of these new components.  But rather than complying with NEPA, Defendants presented this unanalyzed new program as a *fait accompli* in the FEIS, ROD, and Idaho LUPA.

### 1. Defendants' eleventh hour changes compel additional environmental analysis and public review.

An agency must prepare a supplement to either the draft or final EIS if "(i) [t]he agency makes substantial changes in the proposed action that are relevant to environmental concerns; or (ii) [t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts." 40 C.F.R. § 1502.9(c)(1).  Whether a change in a proposed action is "substantial" enough as to warrant an SEIS is determined "not by the modification in the abstract, but rather by the significance of the environmental effects of the changes." *Public Employees for Envtl. Responsibility v. U. S. Dept. of the Interior*, 832 F. Supp.2d 5, 29-30 (D.D.C. 2011) (citations omitted).  The D.C. Circuit has noted supplementation may also be appropriate to cure procedural deficiencies, such as in "cases of actual prejudice" resulting from a deficiency in the DEIS, "where, for example, omissions leave the agency without public comment on a material environmental aspect of a project and leave the relevant public without information about a proposed project . . . ." *Nat'l Committee for the New River v. F.E.R.C.*, 373 F.3d 1323, 1329 (D.C. Cir. 2004).

The three post-DEIS additions to the Proposed Plan in the FEIS comprise a substantial change to the alternatives analyzed in the DEIS, and arose out of documents prepared without public scrutiny released after the DEIS was issued.  These additions require preparation of an SEIS under 40 C.F.R. § 1502.9(c)(1)(i), because they are "changes that cause effects which are significantly different from those already studied . . . ." *Davis v. Latschar*, 83 F. Supp. 2d

1, 9 (D.D.C.1998), *adopted and aff'd,* 202 F.3d 359 (D.C. Cir. 2000) (quoting *Corridor H Alternatives, Inc. v. Slater*, 982 F. Supp. 24, 30 (D.D.C.1997)).  These three material additions were adopted in the ROD and LUPA without further environmental analysis of their very real on-the-ground effects. *See, e.g.*, Moore Decl. ¶¶23-25; Otter Decl.¶¶4-9; Brackett Decl. ¶¶16-19; Chatburn Decl. ¶¶15-17; Gould Decl. ¶¶10-14 (discussing harms).  Moreover, by waiting until after issuance of the DEIS to change direction, Defendants precluded meaningful public participation in the evaluation of the final decision, insulated their actual decision-making process from public scrutiny, and nullified NEPA's action-forcing processes. *Florida Power & Light Co. v. United States*, 846 F.2d 765, 771 (D.C. Cir. 1988) (agencies must give adequate time for public comment and "must provide sufficient factual detail and rationale" to permit interested persons to comment meaningfully).

### a.  *"Net conservation gain" mitigation standard.*

Defendants will require mitigation for third-party actions that will adversely impact sage-grouse or their habitat, in both priority and general habitat zones, to be designed to the "net conservation gain" mitigation standard first articulated in the FEIS. *See, e.g.*, FEIS 2-4; BLM ROD 1-36; BLM LUPA 1-11;[15] 2-14 (MD SSS 30); Forest Service ROD at 37; Forest Service LUPA at 78 (GRSG-GEN-ST-005).[16]  BLM and the Forest Service state that they "will require and ensure" mitigation that provides a net conservation gain to the species accounting for any uncertainty associated with the effectiveness of such mitigation.  FEIS at 2-77.  The FEIS does not analyze the environmental impacts of applying this unclear but uniform standard to all areas where sage-grouse are found, regardless of habitat value.  The BLM ROD, for example, does little to flesh out this standard, repeating only that this standard "is consistent with" the post-DEIS FWS Mitigation Framework.  BLM ROD at 1-25, 1-36 (noting that mitigation must be designed to "the recommendation included in [the FWS Mitigation Framework]").  Such a vague and unclear performance standard on its face precludes reasonable environmental analysis.

---

[15] Perry Decl. Ex. 20 provides the relevant excerpts to the BLM LUPA.
[16] Perry Decl. Ex. 22 provides the relevant excerpts to the Forest Service LUPA.

The concept of "net conservation gain" is not discussed anywhere in the DEIS or proposed as a mitigation standard by any of the alternatives.  Nor does any alternative in the DEIS propose a uniform mitigation standard that applies to all sage-grouse habitat, regardless of value and importance.  The DEIS only analyzed "no net unmitigated loss" (Alternative D) and an "in-lieu of" fee structure (Alternative E) as potential mitigation.[17] DEIS at 2-16, 2-81.  The FEIS does not discuss how the environmental impacts of the "net conservation gain" standard differ from the "net unmitigated loss" management standard or in-lieu of" fee program, yet the agencies must have intended that the new, apparently affirmative, standard would have different environmental results.  Indeed, the FWS Mitigation Framework itself states that "Programs that are structured with a goal of only no net loss will be evaluated more conservatively by the Service because they are unlikely to positively influence the conservation status of the species." FWS Mitigation Framework at 4.

A change of a key policy, such as the net conservation gain mitigation standard, after publication of an EIS requires preparation of an SEIS.  In *League of Wilderness Defenders/Blue Mountains Biodiversity Project v. Connaughton*, 752 F.3d 755 (9th Cir. 2014), the Forest Service was required to prepare an SEIS when it rescinded a policy regulating off-road motorized travel and reducing the amount of roads within a national forest after the publication of a DEIS on a proposed logging project.  The court found the analysis in the DEIS explicitly relied on the policy to mitigate harms from the project and likely rendered the DEIS deficient, meriting issuance of a preliminary injunction.  *Id.* at 761.  The court observed that

> When the public reviews an EIS to assess the environmental harms a project will cause and weighs them against the benefits of that project, the public should not be required to parse the agency's statements to determine how an area will be impacted, and particularly to determine which portions of the agency's analysis rely on accurate and up-to-date information, and which portions are no longer relevant.

---

[17] Alternatives B, C, and F did not discuss mitigation, since each of those alternatives would have imposed broad NSO management or widespread ACECs in all zones.

*Id.*  Without supplemental analysis of impacts based on the new policy, "the public would be at risk of proceeding on mistaken assumptions."  *Id.*

Similarly, in *Klamath Siskiyou Wildlands Center v. Boody*, 468 F.3d 549, 561 (9th Cir. 2006), BLM was required to prepare an SEIS after amending resource management plans "by adopting policies unequivocally rejected in previous agency actions and scientific analyses." The policy change "raise[d] substantial questions" regarding the project's impact, which was enough to require further analysis before the project could be allowed to proceed.  *Id.* at 562. *See also Oregon Natural Res. Council Fund v. Forsgren*, 252 F. Supp. 2d 1088 (D. Or. 2003) (granting preliminary injunction because new Forest Service mapping direction for primary lynx habitat improper without preparation of an SEIS).

The imposition of the previously undisclosed and unanalyzed "net conservation gain" mitigation standard is not a variation of alternatives in the Idaho DEIS, and there was no way the public or Plaintiffs could have commented on its impacts.  Nor have Defendants taken or documented a "hard look" at such impacts.  In such circumstances, a supplement to the FEIS is required by NEPA.

### b.  Sagebrush Focal Areas.

The agencies describe SFAs as subject to the most restrictive management requiring the avoidance and minimization of additional disturbance.  BLM ROD at 1-20; Forest Service ROD 20-21.  The management prescriptions for SFA severely curtail land uses in the specific geographic areas which comprise them, starting with the imposition of NSO without waiver, modification or exception for fluid mineral development and withdrawal from mineral entry under the Mining Law of 1872.  FEIS at 2-2; 2-27.

The agencies insist in the FEIS that "management of these areas as SFAs and the impacts of the associated management decisions was addressed in the DEIS and is qualitatively within the spectrum of alternatives analyzed."  FEIS at 2-2.  The agencies' rationale was the alternatives in the DEIS included some of the closures and measures that would be imposed in SFAs in an alternative's variation of priority habitat.  *Id.*  Defendants apparently justify their

"mix and match" approach by relying on a guide to NEPA published in the Federal Register, in which the Council on Environmental Quality ("CEQ") explains that an SEIS is unnecessary when a new alternative is "qualitatively within the spectrum of alternatives that were discussed in the draft" and is only a "minor variation" from those alternatives.  Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,035 (March 23, 1981) ("Forty Questions").

The DEIS did not identify these particular areas as SFAs and they are not a subset of lands subject to the combination of prescriptions of any of the various DEIS alternatives. Moreover, SFAs include areas that were not previously identified as priority or important habitat, and appear to include areas that are not sage-grouse habitat at all.  Moore Decl. ¶24; Miller Decl. ¶28 (non-scientifically based inclusion of approximately 300,000 acres of non-habitat in the SFA zone).  Consequently, their collective designation is not a "minor variation" of the DEIS alternatives, which applied particular management measures to different degrees in different geographic areas.[18]  *See Dubois v. U.S. Dep't of Agric.*, l02 F.3d 1273, 1292 (1st Cir. 1996) (new alternative in an FEIS was "not merely a reduced version of a previously considered alternative" but a different configuration of activities and locations, requiring an SEIS and public comment).

Neither the DEIS or the FEIS analyzed the environmental impacts of the stringent measures on the specific locations identified as SFAs in the FEIS, yet those impacts are foreseeable and likely to occur.  For example, the "checkerboard" nature of state and federally managed lands in Idaho means that the complete closure of a particular area of BLM-managed land to surface disturbance likely means that the State cannot access or conduct development on the lands that it manages. Schultz Decl. ¶¶3-9, 37-38; Ex. 38 (map); Otter Decl. ¶7. Management of public lands as SFAs will impact the construction of transmission lines, shifting their locations from public to private lands, resulting in unanalyzed environmental impacts and higher costs to Idaho ratepayers.  Chatburn Decl. ¶¶14-17.

---

[18] Moreover, on October 20, 2015, BLM published revised maps designating SFA areas. 80 Fed. Reg. 63,583 (Oct. 20, 2015).  This SFA configuration also was not discussed or analyzed in the DEIS.

The location of development and non-development greatly influences the likelihood and extent of both negative and beneficial impacts on habitat.  *See, e.g., State of New Mexico ex rel Bill Richardson v. BLM*, 565 F.3d 683, 706 (10th Cir. 2009) ("Disturbances on the same total surface acreage may produce wildly different impacts on plants and wildlife depending on the amount of contiguous habitat between them.")  Decreasing the amount of grazing in SFAs may in fact harm sage grouse and their habitat, since strategic grazing can be used as a tool to abate or mitigate wildfire, a primary identified threat to sage-grouse in Idaho.  Brackett Decl. ¶23.

Moreover, creation of SFAs went beyond recombining or modifying components of the DEIS alternatives to create a "new" alternative whose impacts could easily be predicted from the existing analysis.  *Cf.* Forty Questions, 46 Fed. Reg. at 18,035 (noting that a decision to build 5,000 housing units would be within the scope of an EIS analyzing the effects of 4,000 or 6,000 houses and would not require a supplement).  There is no direct or reliable way to compare the effects of the combined SFA restrictions to the effects of the restrictions analyzed in the DEIS in different locations and combinations.  *Richardson*, 565 F.3d at 706; s*ee also California v. Block*, 690 F.2d 753, 772 (9th Cir.1982) (concluding that supplemental analysis is required when the selected alternative "could not be fairly anticipated by reviewing the draft EIS alternatives").

### c.   *Uniform lek buffers.*

A default lek buffer distance by permitted activity in all habitat zones, generally set at a default range of 3.1 miles, regardless of importance or value, across the entire multi-state planning area was not included in any alternative in the Idaho DEIS.  FEIS 2-3, 2-34, Appendix DD.  The agencies asserted without support in the FEIS that "Although the [USGS] buffer report was not available at the time of the DEIS release, applying these buffers was addressed in the DEIS and is qualitatively within the spectrum of alternatives analyzed."  FEIS at 2-3.  But the environmental impacts of the complete closure of important habitat areas to particular activities are not the same as placing a certain distance between a particular activity and a particular lek across *all* habitat in *all* zones.  Chatburn Decl. ¶16; Brackett Decl. ¶19.  The FEIS does not adequately analyze the impacts of this uniform default buffer on particular activities or

geographic areas, nor could the public comment on its potential impacts based on the DEIS alternatives. Yet this new buffer requirement directly affects the conduct of grazing, mineral extraction, and development of state lands. *See, e.g.*, Otter Decl. ¶¶11; Brackett Decl. ¶19; and Chatburn Decl. ¶16.

The uniform and default lek buffers in effect shift the locations of many activities. This action affects "environmental concerns in a different manner than previous analyses," and requires supplementation even though the concept of buffers was included in Alternatives D and E in the DEIS. *Richardson,* 565 F.3d at 707. Nor can a supplement be avoided because a new alternative is more restrictive than previously analyzed alternatives. *Id.* This comparison is appropriate only for assessing the reasonableness of a range of alternatives, and an agency may not decline to analyze a new alternative "simply because the overall level of environmental protection it offers falls between that offered by analyzed alternatives." *Id.* at 706 & n.28. *See Lemon v. McHugh,* 668 F. Supp. 2d 133, 140-41 (D.D.C. 2009).

Defendants are required to supplement the FEIS based on 40 C.F.R. § 1502.9(c)(1)(i) because of the substantial changes to the proposed agency action. Defendants' last minute changes will have substantial environmental, social, and economic impacts on Idaho and southwestern Montana that were not analyzed in the DEIS. *See, e.g.*, Otter Decl. ¶¶9, 11; Gould Decl. ¶¶9-10; Chatburn ¶¶15-17. It is also a long-established tenet of NEPA that significant new information must be analyzed in a supplemental EIS so that the benefits and negative impacts stemming from proposed action can be evaluated by the agency and the public.[19] *See Russell Country Sportsmen v. U.S. Forest Serv.*, 668 F.3d 1037, 1048 (9th Cir. 2011) (new alternative

---

[19] Defendants are also required to supplement under 40 C.F.R. § 1502.9(c)(1)(ii) because of new information used to justify these significant changes. *Marsh,* 490 U.S. at 373–74; *Olmsted Falls,* 292 F.3d at 274. Defendants relied upon at least two post-DEIS scientific studies to modify the alternatives in the DEIS. The uniform lek buffers stem from the USGS Lek Buffer Study released after issuance of the DEIS. FEIS at 2-3, ROD at 1-23. Areas for SFAs were identified in part based on a 2015 study considering the conservation value of range-wide connectivity of sage-grouse habitat by Crist. Crist, Michele R., Steven T. Knick, and Steven Hanser. 2015. *Range-wide network of priority areas for greater sage-grouse—A design for conserving connected distributions or isolating individual zoos?* BLM ROD at 1-16 n. 4. Examination of the full administrative record may reveal additional significant post-DEIS information.

"may lessen environmental impacts and yet fall outside the range of alternatives discussed in a draft EIS. Supplementation may be required, for example, when modifications to a proposed action, although lessening environmental impacts, also alter the overall cost-benefit analysis of the proposed action"); *Com. of Mass. v. Watt*, 716 F.2d 946 (1st Cir. 1983) (supplement required because adverse environmental consequences of the action may not be justified by drastically reduced economic benefit); *Essex County Preservation Ass'n v. Campbell*, 399 F. Supp. 208, 215-16 (D. Mass. 1975) ("There cannot be responsible decision-making when data appears in the final EIS without being subject to the critical evaluation that occurs in the draft stage.")

Public and stakeholder scrutiny of the environmental tradeoffs from SFAs, uniform lek buffers, and the net conservation standard is exactly what was prevented by Defendants' post-DEIS change in direction. Without environmental analysis and public comment on the impacts of these new measures, Plaintiffs are unable to compare the conservation benefits and negative impacts of the Idaho LUPA with the benefits and impacts that would occur as a result of listing sage-grouse under the ESA.  Otter Decl. ¶50; Bedke Decl. ¶¶12-13.

Plaintiffs are likely to succeed on the merits of their claim that Defendants violated 40 C.F.R. § 1502.9(c)(1), and are entitled to an injunction pending resolution on the merits.

### B.  Defendants violated FLPMA and NFMA by creating 3.8 million acres of *de facto* ACECs and zoological areas without following the required process.

SFAs should have been properly disclosed and analyzed as ACEC and Zoological Area designations in observance of specific procedural requirements in FLPMA and NFMA. But rather than follow the statutes, the agencies simply re-named this flawed concept to skirt both their procedural obligations and multiple use mandates.

### 1.  *Process for ACEC designation*

FLPMA, also known as BLM's Organic Statute, "was enacted 'to provide the first comprehensive, statutory statement of purposes, goals, and authority for the use and management of about 448 million acres of federally-owned lands administered by the Secretary of the Interior through the Bureau of Land Management.'"  *Defenders of Wildlife v. Andrus*, 627 F.2d 1238,

1248 (D.C. Cir. 1980) (quoting S. Rep. No. 94-583 (1975)). While FLPMA thus "imposes on the Secretary a general duty to plan for and manage federal land and resources," Congress "carefully and explicitly" allocated functions between states and the federal government, "assign[ing] the states the primary responsibility for the management of wildlife programs within their boundaries." *Id.* (internal quotations omitted).

As part of this land use planning, FLPMA directs BLM to consider the designation of ACECs. An ACEC is an area on BLM-administered lands "where special management attention is required (when such areas are developed or used or where no development is required) to protect and prevent irreparable damage to important historic, cultural, or scenic values, fish and wildlife resources or other natural systems or processes, or to protect life and to ensure safety from natural hazards." 43 U.S.C. § 1702(a).  To be considered as a potential ACEC, an area must meet relevance and importance criteria and require special management attention.  43 C.F.R. § 1610.7-2.  For purposes of this analysis, an area meets the "relevance" criterion if there is a "significant historic, cultural, or scenic value; a fish or wildlife resource or other natural system or process; or natural hazard."  43 C.F.R. § 1610.7-2(a); Areas of Critical Environmental Concern, BLM Handbook 1613 (1988) ("BLM Handbook 1613"), at .11.A, Perry Decl. Ex. 24.  The "importance" prong requires "substantial significance and values," and "generally requires qualities of more than local significance and special worth, consequence, meaning, distinctiveness, or cause for concern." BLM Handbook 1613, at .11.B.

An initial ACEC evaluation is accomplished by an interdisciplinary team, and concurred with by the District Manager.  *Id.* at .21.C.  Management prescriptions must be developed for all potential ACECs during the formulation of alternatives.  *Id.* at .22.B. Proposed designation is based on whether a potential ACEC requires *special management attention* in the selected plan alternative.  *Id.* at .23 (emphasis added).  After completing the analysis of the effects of each alternative, the manager selects the preferred plan alternative which best meet the planning criteria and the guidance applicable to the area.  *Id.* at .23.A.  The State BLM Director, upon approval of a *draft* resource management plan or plan amendment, "shall publish a notice in the

Federal Register listing each ACEC proposed and specifying the resource use limitations, if any, which would occur if it were formally designated.  The notice shall provide a 60-day period for public comment on the proposed ACEC designation."  43 C.F.R. § 1610.7-2(b); BLM Handbook 1613, at .32.

### 2.  *Process for Zoological Area designation*

NFMA, "which seeks to balance the protection of natural ecosystems on public lands with the industrial and recreational uses of those lands, was Congress' attempt to address the conflicting interests that often vie for priority when forest resources are at stake."  *Federal Forest Resource Coalition v. Vilsack*, -- F. Supp. 3d ---, CA No. 12-1333 (KBJ), 2015 WL 1906022, at *2-3 (D.D.C. April 28, 2015) (internal quotations and citation omitted).  NFMA requires the Forest Service to "develop, maintain, and, as appropriate, revise land and resource management plans for units of the National Forest System . . . ."  16 U.S.C. § 1604(a).  "In doing so, the Forest Service must 'balance competing demands on national forests, including timber harvesting, recreational use, and environmental preservation.'"  *Southeast Conference v. Vilsack*, 684 F. Supp. 2d 135, 138 (D.D.C. 2010) (quoting *Lands Council v. Powell,* 395 F.3d 1019, 1025 n.2 (9th Cir. 2005)).  "Indeed, . . . 'the law regulating the use of national forests embraces the concepts of 'multiple use' and 'sustained yield of products and services.'"  *Id.* at 138 (quoting *Lands Council,* 395 F.3d at 1025 n.2).  Like FLPMA, NFMA provides states with an elevated "advisory role" regarding federal resource management planning efforts, requiring forest planning to be "coordinated with the land and resource management planning processes of State and local governments and other Federal agencies." *California Coastal Com'n v. Granite Rock Co.*, 480 U.S. 572, 585 (1987); *see* 16 U.S.C. § 1604(a).

Under NFMA, "recreational areas" are areas "other than wilderness or wild areas, which should be managed principally for recreation use . . . ."  36 C.F.R. § 294.1.  These "recreational areas" can include "Zoological Areas," areas that include "animal specimens, animal groups, or animal communities that are significant because of their occurrence, habitat, location, life

27

history, ecology, rarity, or other features." Forest Service Manual 2300, at 2372.05. The designation of such areas "shall constitute a formal closing of the area to any use or occupancy inconsistent with the classification." 36 C.F.R. § 294.1(b).

Zoological Areas greater than 100,000 acres must be designated by the USDA Secretary. *Id.* at 294.1(a). Further, the Chief of the Forest Service must "notify the House Committee on Interior and Insular Affairs and the Senate Committee on Energy and Natural Resources of any pending designation of 100,000 acres or larger and of any proposal to withdraw 5,000 acres or more from application of the mining laws." Forest Service Manual 2300, at 2372.04b. Neither action was taken here.

### 3. *Defendants violated FLPMA and NFMA*

Here, the agencies called for and received nominations for ACECs and Zoological Areas to protect sage-grouse and its habitat, as described in Alternatives C and F. DEIS 1-24, 2-27, 3-120; Appendix H. The DEIS described the "special management attention" of a potential ACEC for sage-grouse as "management actions that create the potential for resource degradation—such as mineral development, livestock grazing, and infrastructure development—could impact the relevant and important values for which an ACEC is designated." DEIS 4-209. For example, "[t]hese restrictions include…*NSO* (No Surface Occupancy), ROW (Right-of-way) exclusion or avoidance, and locatable mineral withdrawal recommendations, as well as other use constraints." DEIS 2-61.

BLM determined that areas nominated for ACEC designation did not meet the relevance criteria (significant wildlife resource) if they were outside of identified preliminary priority habitat; thus, rejecting any of the conservation community nominations outside that designation. *See* DEIS Appendix H-3; FEIS Appendix S-3. Consequently, "[a]s a result, of the evaluation process, it was determined that *xx acres* met the relevance criteria." DEIS at H-4 (emphasis added). BLM summarily concludes without any analysis that "all areas that met the relevance

criteria were determined because protection of [sage-grouse] is a national priority for BLM." *Id.*
The FEIS clarified that over 7 million acres met the criteria. FEIS App. S-3.

Although the acres identified in FEIS Appendix S met the requisite ACEC criteria, the
BLM in the DEIS nevertheless did not recommend any new ACECs for sage-grouse. The DEIS
only states that: "53 existing ACECs containing 325,000 acres of occupied GRSG habitat would
be maintained." Idaho DEIS 2-61.[20] The only reasonable conclusion, based on BLM's
Handbook 1613, is the BLM State Director believed "standard or routine management
prescriptions," or alternatively, the conservation actions afforded by the co-preferred alternatives
were sufficient to meet the purpose and need. BLM Handbook 1613, at .33E. This is reinforced
by the following statement: "All of the action alternatives would generally result in greater
restrictions, compared to the continuation of existing management under Alternative A.
Adopting more restrictive management of surface-disturbing activities under the action
alternatives would be *complementary* to the protection of the relevant and important values of the
existing ACECs." DEIS 4-210 (emphasis added). BLM did not recommend any new ACECs in
the preferred alternatives, DEIS 2-45, or issue a 60-day notice in the Federal Register with the
DEIS in accordance with its planning regulations and appropriately rejected the ACEC
nominations in Alternatives C and F at the draft stage. It then improperly imposed them in the
final action.

Defendants violated FLPMA and NFMA by designating over 3 million acres of *de facto*
ACECs and 236,800 acres of *de facto* Zoological Areas in the Idaho LUPA without following
the requisite process. Comparing an ACEC's "special management attention," as outlined in the
DEIS, with the singular important and severe management restrictions of the SFA zone, yields
no other conclusion than Defendants simply re-named ACECs and Zoological Areas as "SFAs."

---

[20] *See also* Idaho DEIS at 2-64 (Alternative B no additional ACEC designation); 2-66 (Alternative D no additional
ACEC designation); and the Governor's Plan (Alternative E) did not nominate or recommendation additional ACEC
designations.

To illustrate, "special management attention" is clearly implicated by the ROD's description of SFAs as "the areas identified by the FWS as GRSG *strongholds*" and represent 'a subset of priority habitat *most vital* to the species persistence within which we recommend the *strongest levels of protection*.'" BLM ROD at 1-15 (emphasis added); Forest Service ROD at 24. "SFAs are areas of highest habitat value for GRSG and are managed to avoid new surface disturbance for the following reasons: they contain high-quality sagebrush habitat and the highest breeding bird densities; they have been identified as *essential* to conservation and persistence of the species; they represent a preponderance of current federal ownership; and in some cases, they are next to protected areas that serve to *anchor* the conservation importance of the landscape." BLM ROD at 1-16. Indeed, in FWS's recent "not warranted" decision, that agency describes the SFA zone as "critically important for the species," and "within which land managers will apply the most *conservative strategies* to protect sage-grouse and habitat." 80 Fed. Reg. at 59,875, 59,878 (emphasis added).

Management of SFAs likewise mirrors the stringent measures described in the  DEIS description of a sage-grouse ACEC:  a) recommended for withdrawal from the General Mining Act of 1872, as amended, subject to valid existing rights; b) managed as NSO without waiver, exception, or modification, for fluid mineral leasing; and c) prioritized for vegetation and management actions in these areas, including, but not limited to land health assessments to review of livestock grazing permits/leases, and habitat restoration.  BLM LUPA at 2-9 (MD SSS 10)).

Plaintiffs are likely to succeed on their claim that SFAs are nothing more than a guise for widespread ACEC and Zoological Area designation; and procedurally violated FLPMA and NFMA in their adoption.

## C.  The "net conservation gain" management standard adopted by BLM violates FLPMA.

As discussed above, the BLM ROD and the Idaho LUPA provide that land uses resulting in sage-grouse habitat loss and degradation will be required to implement "mitigation that

provides a net conservation gain to the species."[21]  FLPMA does not authorize BLM to

implement this newly-minted standard.

FLPMA mandates that the Secretary of the Interior, and BLM acting in her stead, "take

any action necessary to prevent unnecessary or undue degradation of the [public] lands."  43

U.S.C. § 1732(b).  This places a substantive obligation on BLM to manage the public lands to

prevent "unnecessary or undue degradation" ("UUD"), which it does by imposing measures

sufficient to "prevent degradation unnecessary to, or undue in proportion to," the authorized use.

*Theodore Roosevelt Cons. P'ship v. Salazar*, 661 F.3d 66, 76 (D.C. Cir. 2011).  In applying the

UUD standard, BLM must prevent degradation that, while necessary to the authorized land use,

is undue or excessive.  *Mineral Policy Ctr. v. Norton*, 292 F. Supp. 2d 30, 43 (D.D.C. 2003).

While "net conservation gain" is poorly defined in the Idaho FEIS and the BLM ROD, it

is clear that it is intended to be more stringent than FLPMA's UUD standard.  The only

definition Defendants provide for the term "net conservation gain" is a parenthetical in the BLM

ROD and the glossary in the BLM LUPA, both indicating that "net conservation gain" means

"actual benefit or gain above baseline conditions."  BLM ROD at 1-25; BLM LUPA at 5-7.  The

BLM ROD does provide a brief explanation of the intended effect of this standard:

> If impacts from BLM management actions and authorized third-party actions result in
> habitat loss and degradation that remains after avoidance and minimization measures
> are applied, then compensatory mitigation projects would be used to provide a net
> conservation gain to the species.

BLM ROD at 1-25.  An appendix to the BLM LUPA also describes a screening process for

evaluating the impact of proposed land uses on sage-grouse populations and habitat.  BLM

LUPA at F-18 – F-20.  It would allow BLM to consider an application for a land use that may

result in direct or indirect impacts to sage-grouse habitat or population only if "compensatory

mitigation can be applied to provide for a net conservation benefit to the species," but directs

---

[21]  The term is referenced repeatedly: BLM ROD at 1-17, 1-19, 1-21, 1-22, 1-23, 1-24, 1-25 – 1-26, 1-31, 1-32, 1-36, 2-6, 2-7; BLM LUPA at 1-11, 1-13, 1-14, 2-12, 2-13, 2-14, 2-32, 2-33, 5-7, B-2, F-1,F-3, F-4, F-18 – F-20, G-2, G-6.  But how it is to be applied receives short shrift.

BLM to reject or defer proposals "if the impacts cannot be effectively reduced, minimized or compensated." BLM LUPA at F-20. Neither the BLM ROD nor the BLM LUPA attempt to reconcile this standard with FLPMA's UUD requirement.

The ROD attributes the "net conservation gain" standard not to FLPMA or to any BLM regulations or policies, but rather to the FWS Mitigation Framework. BLM ROD at 1-25. The FWS Mitigation Framework was not developed to implement FLPMA. On its first page, it identifies a dual purpose: (1) to help BLM develop mitigation that will reduce the potential need to list greater sage-grouse under the ESA, and (2) should ESA listing occur, improve ESA Section 7 consultations and contribute to sage-grouse "recovery," an ESA concept. FWS Mitigation Framework at 1. Thus, the "net conservation gain" standard was developed to achieve ESA purposes and was not in response to FLPMA's directives.

FWS also expressly intends "net conservation gain" to be more stringent than the "no net loss" standard BLM had proposed in the Idaho DEIS (itself likely more stringent than UUD). The FWS Mitigation Framework rejects mitigation programs "structured with a goal of only no net loss … because they are unlikely to positively influence the conservation status of the species." *Id.* at 4. Instead, FWS maintained: "Mitigation programs should be strategically designed to result in net overall positive outcomes for sage-grouse." *Id.*

Placing the conservation status of sage-grouse above all other land use considerations violates FLPMA's directive that the public lands be managed for multiple-use and sustained yield. *See* 43 U.S.C. § 1732(a); *Theodore Roosevelt Cons. P'ship*, 616 F.3d at 504 ("Multiple use management requires balancing various competing uses of land—'including, but not limited to, recreation, range, timber, minerals, watershed, wildlife and fish, and [uses serving] natural scenic, scientific and historical values'—to optimally manage the land." (quoting 43 U.S.C. § 1702(c)). FLPMA represents a "balance two vital-but often competing-interests": the "need for domestic sources of minerals, food, timber, and fiber from the public lands," and the protection of "the quality of scientific, scenic, historical, ecological, environmental, air, and atmospheric, water resource, and archeological values." *Mineral Policy Center*, 292 F. Supp. 2d at 33

(quoting 43 U.S.C. §§ 1701(a)(12) and (a)(8)).  The ROD and Idaho LUPA lost sight of that balance.

Contrary to the BLM ROD and the BLM LUPA, BLM is bound by FLPMA's direction to use the UUD standard in evaluating proposed land uses.  *See* 43 U.S.C. § 1732(b).  The UUD standard contemplates and allows degradation of public land resources that is necessary to authorized uses, so long as the resulting degradation is not "undue in proportion to" the authorized use.  *Theodore Roosevelt Cons. P'ship*, 661 F.3d at 76.

The D.C. Circuit recently held that BLM had properly applied the UUD standard, in the context of a land use plan amendment and potential impacts on sage-grouse, where the agency recognized that some degradation was necessary to achieve the development authorized by the plan amendment and BLM had required mitigation that "would be adequate to prevent degradation that is unnecessary to, or undue in proportion to," the development authorized by the plan.  *Id*. at 76-77.  The Court of Appeals went on to affirm BLM's selection of a lek buffer mitigation condition that the agency conceded "will not avoid adverse consequences to the greater sage grouse," holding that "FLPMA prohibits only unnecessary or undue degradation, not *all* degradation."  *Id*. at 78.

The "net conservation gain" standard is intended to produce a much different result.  Applying this newly-minted standard, BLM is directed to reject land uses that have *any* direct or indirect impact on sage-grouse or their habitat, unless accompanied by compensatory mitigation that not only offsets the impact, but actually produces a net benefit for sage grouse – an "actual benefit or gain above baseline conditions."  ROD at 1-25, Idaho LUPA at F-18 – F-20.  That is a substantial departure from the D.C. Circuit's determination that FLPMA prohibits "only unnecessary and undue degradation, not *all* degradation."  *Theodore Roosevelt Cons. P'ship*, 661 F.3d at 78.

Plaintiffs are likely to prevail on their claims under FLPMA, since the "net conservation gain" standard created by the BLM ROD and the Idaho LUPA is an unambiguous violation of FLPMA's requirements.

**D.  Interior Defendants violated FLPMA section 202(c)(9) in adopting the Great Basin ROD and Idaho LUPAs.**

FLPMA carves out a special and elevated role for state governors to participate in land use planning by requiring BLM to coordinate such efforts.  43 U.S.C. § 1712(c)(9).  FLPMA

> directs that land use plans developed by the Secretary of the Interior 'shall be consistent with State and local plans to the maximum extent [the Secretary] finds consistent with Federal law,' and calls for the Secretary, 'to the extent he finds practical,' to keep apprised of state land use plans, and to 'assist in resolving, to the extent practical, inconsistencies between Federal and non-Federal Government plans.'

*Granite Rock Co*., 480 U.S. at  585  (quoting 43 U.S.C. § 1712(c)(9)).[22]  Governors must have the opportunity to advise BLM of their positions on draft LUPAs, and BLM must consider this input and ensure that "land use plans…[are] consistent with State and local plans to the maximum extent…[the Secretary of the Interior] finds consistent with Federal law . . . ."  *Id.* at 596 (quoting 43 U.S.C. § 1712(c)(9)).  BLM planning regulations reflect this requirement.  43 C.F.R. § 1610.3-2.

Under FLPMA, land use planning consistency is not the sole province of the Federal government and does not lend itself to a cursory examination.  *See Yount v. Salazar*, 2013 WL 93372, *14 (D. Ariz. Jan. 8, 2013) (noting that "[l]ike NEPA, the procedural requirements of the FLPMA are designed to protect the interests of local governments whenever federal agencies develop or implement federal land-use plans" (citation omitted)).  Prior to approval of a LUPA, a governor may identify to BLM "any known inconsistencies with State or local plans, policies or programs," and may recommend changes to the amendment.  43 C.F.R. § 1610.3-2(e).  Finally, if BLM does not accept these recommendations, the governor may appeal to the BLM National Director, who "shall accept the recommendations of the Governor(s) if he/she determines that

---

[22] Although the Forest Service is not required to ensure maximum consistency with state plans, 36 C.F.R. § 219.4(b)(3), the agency is required under NFMA to "coordinate[] with the land and resource management planning processes of State and local governments and other Federal agencies."  16 U.S.C. § 1604(a).  During this coordination process, the Forest Service reviews state land use policies, including consideration of "[o]pportunities to resolve or reduce conflicts, within the context of developing the plan's desired conditions or objectives."  36 C.F.R. § 219.4(b)(2)(iv).  Like FLPMA, these coordination requirements were intended to "help identify multiple uses in the plan area, resolve conflicts, and facilitate the forward movement of effective land management activities."  77 Fed. Reg. 21,162, 21,177 (Apr. 9, 2012).

they provide for a reasonable balance between the national interest and the State's interest." *Id.*

Here, Governor Otter fully exercised his statutory prerogative to seek reconciliation of state and federal land use plans. Defendants did not meet their statutory obligations in return, instead driving the process to a pre-determined conclusion. See Otter Decl. ¶¶41, 45, 47; Bedke Decl. ¶¶12-13.

### 1. *The Great Basin ROD and Idaho LUPAs directly conflict with the Governor's Plan*

The Governor's Consistency Review detailed the inconsistencies between the Proposed Plan and the Governor's Plan. He noted that "[a]t first blush, the Proposed Plan purports to adopt the three-tier habitat structure and accompanying management continuum advanced by the Governor's Plan. But the post-DEIS National Direction, including among other measures, the SFAs, uniform lek buffers, new mitigation standards, changes to the adaptive management construct and livestock grazing section, presents a vastly different sage-grouse plan than contemplated by either Alternative E or the other co-preferred alternative." Governor's CR at 10. The Governor's Plan relies on a management continuum providing a high level of protection in the core areas while providing more flexibility in the other management zones. This structure provides predictability for permitted uses and fully aligns with the agency's multiple-use mandate, honors valid existing rights and addresses the primary threats to the species in Idaho. *See* Otter Decl. ¶21; Bedke Decl. ¶6.

The Proposed Plan, by imposing uniform management measures across all habitat zones, no longer maintains the key distinctions between the management zones thereby undermining the Governor's management continuum. This material change will result in inconsistent management approaches between the state and federal government. Moreover, these changes are inconsistent with the FWS COT Report, whereas the Governor's Plan meets its recommendations. Moore Decl. ¶24-26.

### 2.   *Defendants made no meaningful attempt to reconcile state and federal plans to the maximum extent practicable.*

As required by FLPMA, Governor Otter provided a suite of recommendations to reconcile the differences between the Governor's Plan and the Proposed Plan, suggesting either adoption of Alternative E, or in the alternative, adoption of the reconciled and consensus G2 alternative. *See* Governor's CR at 62; Otter Decl. ¶40. Defendants made no meaningful attempt to achieve reconciliation, thereby violating section 202(c)(9).

In its hurried response declining to adopt the Governor's key recommendations for reconciliation, BLM summarily concluded that "several of the State's recommendations would not be consistent with the purposes, policies, and programs of federal laws applicable to public lands." BLM Response at 3. This conclusion was arbitrary and capricious for at least three reasons.

*First,* this finding simply does not square with Defendants' conclusions in both the DEIS and FEIS. Defendants stated the selection of co-preferred alternatives was based on the "satisfaction of statutory requirements"; "achievement of BLM goals and policies"; and "achievement of the purpose and need." DEIS 2-46; FEIS 2-9. BLM offered no explanation for why the Governor's Plan no longer met those objectives, or if it did not meet them at the DEIS stage, it was not relegated to the status of an "alternative considered but eliminated from detailed consideration" as being inconsistent with federal law and policy. *See* DEIS at 2-17.

*Second*, BLM had an example before it, Alternative G2, which reconciled the differences between Alternatives D and E, indicating that in fact reconciling the competing plans was practicable but that Defendants made no effort to do so "to the maximum extent" in response to the Governor's recommendations. Indeed, BLM's explanation for why it denied the Governor's appeal is not based on FLPMA's practicability standard: Defendant Kornze explained that to "avoid a potential listing," these federal plans "need[ed] to provide a high degree of regulatory certainty that those plans will be implemented and be effective. To achieve that level of certainty, BLM has included common elements across the range to address specific threats to the

species and its habitat.  The purpose of these common elements is to provide for a net conservation gain for the GRSG."  Kornze Denial at 2.  Defendants offered no reasoned analysis of why the Governor's recommendations were not capable of being implemented and would not be effective.

*Third,* Defendants' decision impermissibly substitutes perceived ESA mandates of uniformity and certainty for the fundamental and explicit mandates of FLPMA – namely, multiple-use of federal lands and a "reasonable balance between national and state interests" in planning efforts.  If Congress wanted land use planning under FLPMA to be the sole province of the Federal government, it would not have required consistency review.  In sum, other than making a minor adjustment to the grazing portion of the SFA language, Defendants arbitrarily and capriciously refused to adopt the Governor's recommendations.

### 3. Interior Defendants also violated their FLPMA consistency obligations by failing to circulate the Governor's recommendations for public review.

BLM regulations require the agency to ensure that the public has the opportunity to review and comment on a state's written recommendations. 43 C.F.R. § 1610.3-2(e).

> If the written recommendations of the Governor(s) recommend changes in the proposed plan or amendment which were not raised during the public participation process on that plan or amendment, the State Director shall provide the public with an opportunity to comment on the recommendation(s).

Here, BLM refused to provide Governor Otter's recommendations, including the consideration of Alternative G2, to the public with an opportunity to comment.  *See* Otter Decl. ¶40-41.  This failure could have been cured by acting on the Governor's recommendation to issue an SEIS.  *Cf.  Richardson*, 565 F. 3d at 720 (BLM complied with its FLPMA consistency obligations by adopting one of the Governor's core recommendation and circulating it for public review by issuing an SEIS).

Plaintiffs are likely to prevail on their claims that Defendants violated FLPMA by failing to resolve the numerous inconsistencies between the plans to the "maximum extent possible;"

relied on impermissible factors to conclude that the Governor's Plan is not a "reasonable balance;" and failed to circulate the Governor's recommendations for public review.

## IV.   PLAINTIFFS ARE LIKELY TO SUFFER IRREPARABLE HARM IN THE ABSENCE OF A PRELIMINARY INJUNCTION.

Defendants' unlawful actions have infringed upon Idaho's sovereign authority, disrupted the management of the lands granted to Idaho at Statehood and managed for the benefit of the State's public schools and other institutions, diverted resources from the primary threats to sage-grouse and their habitat, and threatened the State's economy.  *See, e.g.*, Otter Decl. ¶¶48-54; Schultz Decl. ¶¶5-9, 38; and Bracket Decl. ¶24.  These injuries are occurring now and would be minimized by a preliminary injunction staying the Idaho LUPA.

To obtain a preliminary injunction, Plaintiffs must demonstrate that they are likely to suffer irreparable harm in the absence of injunctive relief.  *Winter*, 555 U.S. at 22; *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 38 (D.D.C. 2013).  To meet the threshold of irreparable injury, "the injury must be both certain and great; it must be actual and not theoretical."  *Wis. Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir.1985) (per curiam).  Economic loss does not, in and of itself, constitute irreparable harm.  *Id.*  But if a movant seeking a preliminary injunction will be unable to sue to recover any monetary damages against a government agency in the future because of, among other things, sovereign immunity, financial loss can constitute irreparable injury.  *See Brendsel v. Office of Fed. Hous. Enter. Oversight*, 339 F. Supp. 2d 52, 66-67 (D.D.C. 2004).  Here, Plaintiffs and the Idaho residents they represent would be unable to recover from the federal government for the economic losses they are suffering due to Defendants' unlawful actions.[23]

As discussed in section III.A, *supra,* the grounds for issuing a preliminary injunction in this case include Defendants' violations of NEPA's procedural requirements.  "When a

---

[23] Plaintiffs in this case bring their claims under the APA, which provides such a waiver, but the waiver specifically limited to actions seeking relief "other than money damages . . . ."  5 U.S.C. § 702.  Thus, the APA does not waive sovereign immunity for "an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation."  *Bowen v. Massachusetts,* 487 U.S. 879, 893 (1988).

procedural violation of NEPA is combined with a showing of environmental or aesthetic injury, courts have not hesitated to find a likelihood of irreparable injury." *Brady Campaign to Prevent Gun Violence v. Salazar*, 612 F. Supp. 2d 1, 24 (D.D.C. 2009) (irreparable injury demonstrated by showing that some environmental impacts were likely to occur, even if the extent of those impacts were unknown (citations omitted)).

Defendant's illegal actions infringe on Governor Otter's ability to exercise his sovereign authority as governor. This is manifested in two ways. First, the State is solely responsible for managing sage-grouse in Idaho. Otter Decl. ¶¶3-4; Moore Decl. ¶7. Under Idaho law, the State owns all wild birds within the State of Idaho, including sage-grouse, and Idaho accepts responsibility for assuring that such birds are "preserved, protected, perpetuated, and managed." Idaho Code § 36-103(a). However, 67 percent of sage-grouse habitat in Idaho is on federal lands. When Defendants, as managers of a substantial portion of the sage-grouse habitat in Idaho, make decisions purportedly for the benefit of the sage-grouse but do not coordinate those actions with the State or resolve differences to the maximum extent practicable, the actions wrongly infringe on the State's sovereign responsibility and authority to manage sage-grouse. *See* Otter Decl. ¶49; Bedke Decl. ¶13; Moore Decl. ¶28.

Second, the Defendants' actions also interfere with Governor Otter's execution of his trust responsibility as manager of the State endowment lands. Otter Decl. ¶¶6-7, 51-52; Schultz Decl. ¶¶3-9. When Idaho became a state, it was granted sections 16 and 36 of every township for the benefit of public schools. Schultz Decl. ¶2. Many of these endowment lands – and most that have sage-grouse habitat – are interspersed with, or surrounded by, BLM- or Forest Service-managed federal public lands. *Id*. By failing to adopt the fundamental elements of Governor's Otter's Plan in the Idaho LUPA, Defendants set up conflicts with the sage-grouse management plan that Idaho developed for the adjacent and interspersed Idaho endowment lands.

Among other impacts, the Idaho LUPA's NSO restrictions in SFAs will preclude fluid mineral development on federal lands, but also greatly diminish the desirability of leasing on the intermingled endowment lands. Schultz Decl. ¶¶3-9. About 324,000 acres of endowment lands

are located within or adjacent to SFAs.  *Id*. at ¶3.  This SFA prescription will cost the state lost rents, royalties and taxes (income, sales, property and employment), thereby denying revenues to the State's schools and other endowments.  *Id.* at ¶¶3-5; Otter Decl. ¶51.  Similarly, the closing of SFA lands to mining activity is likely to curtail mining on adjacent and intermingled State endowment lands.  Schultz Decl. ¶¶6-8.  BLM has issued a notice of its intent to withdraw approximately 10 million acres in Idaho and other states from mineral entry in response to the SFA management prescriptions in the Idaho LUPA.  80 Fed. Reg. 57,635 (Sept. 24, 2015).  That notice has the effect under BLM's regulations of immediately closing those lands from entry for the next two years.  *See id*. at 57,637.  SFAs also will adversely impact grazing on intermingled endowment lands.  Gould Decl. ¶11.  Thus, BLM already has taken actions based upon the Idaho LUPA that will impair mineral development on Idaho's endowment lands.

The last-minute introduction of default lek buffers across all of the lands managed under the Idaho LUPAs also disrupts grazing and other land uses, on Idaho endowment and private lands as well as on federally managed lands.  *See* Gould Decl. ¶16; Chatburn Decl. ¶16.  The conditional prohibition of range improvements within 1.2 miles of leks also will interfere with implementing Idaho Rangeland Health Standards for livestock grazing.  Brackett Decl. ¶¶19-20. The combined effect of lek buffers, SFAs and the "net conservation gain" standard preclude or greatly constrain opportunities to develop Idaho's resources and makes providing reliable electric services through transmission line permitting and renewal extremely difficult in southern Idaho, while pushing any development to private lands.  Chatburn Decl. ¶22, Ex. 39.

Idaho also has been working since 2010 to improve the response to wildfire danger on rangelands which can destroy sage-grouse habitat.  Otter Decl. ¶5; Schultz Decl. ¶¶22-27; Bedke Decl. ¶7-9.   The Idaho LUPA's prescriptions will greatly constrain the otherwise viable use of grazing practices as a tool to abate or mitigate wildfire risks, and will impede measures to reduce and replace invasive vegetation species that have invaded former sagebrush areas.  Otter Decl. ¶5; Brackett Decl. ¶¶21-23.

The Idaho LUPA also will likely foreclose or significantly increase the cost of siting of new transmission lines, expanding right-of-ways for retrofits, and maintaining current operations of existing linear features in southern Idaho because of the overly stringent requirements imposed.  Chatburn Decl. ¶15.  In addition to the impact of SFAs, developing a transmission line route that avoids lek buffers in all Idaho LUPA land use zones, without real exceptions, as well as all other sensitive resources "may not be feasible and would significantly increase the overall costs . . . ." *Id.* ¶16.  As a result, the Idaho LUPA will directly harm the State's interest in an affordable and safe supply of electricity.  *Id.* ¶15.

Finally, the poorly-defined "net conservation gain" mitigation standard across all land use zones injects uncertainty that will disrupt permitting for  livestock grazing, transmission line siting, mining and other lawful activities on federal lands and adjacent private and state lands. *See* Otter Decl. ¶4; Chatburn Decl. ¶17.

Plaintiffs have suffered and will continue to suffer irreparable injuries to their sovereign interests in sage-grouse and in the State's endowment lands, as well as the direct loss of revenue to the State and the disruption of lawful activities by the State's residents.  These immediate and ongoing injuries warrant issuance of a preliminary injunction.  *See Brady Campaign*, 612 F. Supp. 2d at 24;  *Wyoming v. U.S. Dept. of the Interior*, __ F.Supp.3d __, 2015 WL 5845145, *17-20 (D. Wyo. Sept. 30, 2015) (wrongful adoption of federal regulatory regime that interferes with a state's sovereign interests constitutes irreparable injury).

## V.      THE BALANCE OF EQUITIES TIPS STRONGLY IN FAVOR OF A PRELIMINARY INJUNCTION.

While Plaintiffs will suffer imminent and irreparable harm from the continued implementation of the ROD and Idaho LUPA, Defendants will suffer no material harm from delaying their implementation during the pendency of this litigation.  *See, e.g.*, *Texas v. United States,* 787 F.3d 733, 767-68 (5th Cir. 2015); *see also District of Columbia v. Greene,* 806 A.2d 216, 223 (D.C. Cir. 2002); *Wyoming*, 2015 WL 5845145 at *20.

There is no biological imperative driving Defendant's hasty adoption of the Idaho LUPA. First, FWS's deadline for revisiting its ESA listing determination for sage-grouse was part of a national settlement agreement that also assigned deadlines for listing determinations for over 250 other candidate species. Indeed, FWS in its 2010 Finding assigned sage-grouse a listing priority of 8, meaning that the threats to sage-grouse are moderate in magnitude and "are not of uniform intensity or of such magnitude that the species requires listing immediately to ensure its continued existence." 75 Fed. Reg. 13,910, 14,008 (Mar. 23, 2010). Moreover, sage-grouse populations have increased 63% since 2013; and increased 13% in Idaho. *See* 2015 WAFWA Report; *see also* Moore Decl. ¶31.

Second, sage-grouse will not be without protection in Idaho during the pendency of this litigation, as conservation of this species has been a priority in Idaho for decades. IDFG has been monitoring sage-grouse habitat and populations for over fifty years, and has implemented a sage-grouse conservation plan since 1996. This plan was updated by sage-grouse local working groups in 2006, and provided key information for the Governor's Plan. Moore Decl. ¶¶8-13, 18. In 2013, the Idaho Legislature codified the Rangeland Fire Protection Association program. Bedke Decl. ¶7. These associations had a tremendous impact on addressing wildfire because they are able to respond to fires much more quickly than federal crews. In 2015, the Idaho Legislature appropriated $750,000 for sage-grouse conservation between the Idaho Department of Lands and the Governor's Office of Species Conservation. Bedke Decl. ¶9.

Third, even setting aside Idaho's wildfire measures, sage grouse are not likely to be placed at risk by rangeland fires while a preliminary injunction is in place. Like most western states, Idaho experiences most wildfires from July to September every year. As temperatures cool and winter approaches, the threat of wildfire is virtually nonexistent. Thus, it is unlikely that Idaho will lose sage-grouse habitat as a result of this key threat before the 2016 wildfire season begins next summer.

Fourth, in their haste to adopt these last-minute changes, Defendants failed to adequately analyze the environmental effects of SFAs, the net mitigation standards, and newly configured

uniform lek buffer distances.  Delaying implementation of the Great Basin ROD and Idaho LUPA may actually benefit sage-grouse as the aggregation and elevation of secondary threats to primary status through these management directives will divert precious agency resources and likely exacerbate the primary threat of wildfire. Otter Decl. ¶5; Moore Decl. ¶18.  Given the important stakes involved, Defendants' failure to take a "hard look" under NEPA counsels for additional review and disclosure.

Finally, if Defendants are concerned that a stay of the Idaho LUPA would place sage grouse at risk, then Plaintiffs would support Defendants applying Governor Otter's Plan or the consensus G2 alternative as an interim management measure on federal lands in Idaho while the Court considers the merits of Plaintiffs' claims.  This approach – use of the State plan as an interim measure while the national plan is finalized – was proposed by the former Secretary of the Interior at the outset of this planning process.  Otter Decl. ¶14.

## VI.    A PRELIMINARY INJUNCTION WOULD BE IN THE PUBLIC INTEREST

Enjoining Defendants from implementing the Great Basin ROD and Idaho LUPA during the pendency of this litigation is in the public interest.  The public has a right to be fully apprised of the reasoning and justification behind significant decisions affecting millions of acres of public land and a "failure to do so ignores the central role assigned by NEPA to public participation." *Natural Res. Def. Council v. Lujan*, 768 F. Supp. 870, 889 (D.D.C. 1991).  The public also has an interest in maintaining the status quo when there a strong likelihood final agency action will be invalidated.  Finally, the public's interest in a viable sage-grouse population will not be harmed because there is no imminent threat to the population and the states are fully capable of managing the species.  *See* Moore Decl. ¶¶ 29-31.

There is little question that the public's interest in the integrity of the regulatory process was violated during the development of the Great Basin ROD and Idaho LUPA.  As of May 2014, BLM, FWS, Forest Service and the State of Idaho reached consensus on a scientifically-based approach for conserving sage-grouse in Idaho – namely Alternative G2.  *See* Moore Decl.

¶22; Otter Decl. ¶31.  From that time to the release of the Ashe Memorandum – a period of approximately four months – Defendants never consulted or even informed the State that Alternative G2 was no longer sufficient.  Instead, Defendants waited until October 2014 to signal potential and significant changes, slow-walked the full implications of that new national direction until January 2015, then advised Idaho that no meaningful flexibility existed to reconcile the differences between the Governor's Plan and the Proposed Plan.  Miller Decl. ¶28, Ex. 36; Otter Decl. ¶¶34-35.

Derailing this important process by changing course at a late stage without providing any scientific rationale or reasoned explanation fails to meet the APA's standards for lawful administrative action. *See, e.g.,* Moore Decl. ¶32 (stating "there appears to be no scientific correlation between sage-grouse populations and the expanded area USFWS identified for SFAs").

The use of the SFA-label to avoid the required procedures to designate ACECs and Zoological Areas also curtails the public's right to a transparent decisionmaking process under FLPMA and NFMA.  Given the national profile of this issue, heightened role of the State and the significant last-minute changes to the Proposed Plan, Defendants should have vetted these issues through an SEIS. Without a proper airing of these issues and supplemental environmental analysis, Plaintiffs' interests in delivering commonsense and collaborative solutions in the future will be greatly injured.  *See* Otter Decl. ¶l53.

Finally, any argument from Defendants that only the measures in the Idaho LUPA serve the public interest in sage-grouse conservation is unpersuasive.  Idaho continues to be proactively engaged in sage-grouse conservation, expending millions of dollars on monitoring, habitat restoration, and conservation plans. *See, e.g.*, Moore Decl. ¶8.  Accordingly, this factor weighs heavily in favor of preliminary relief.  The public interest will be served by enjoining the Great Basin ROD and Idaho LUPA pending a resolution on the merits.

## CONCLUSION

Plaintiffs have demonstrated a likelihood of success on the merits of their claims.  The APA invalidates agency actions taken "without observance of procedure required by law."  5 U.S.C. § 706(2)(D).  In adopting the Great Basin ROD and Idaho LUPA, Defendants made a number of procedural errors.  They did not 1) prepare an SEIS as required by NEPA; 2) follow FLMPA's steps for nomination and consideration of ACECs; 3) implement NFMA's procedure for the creation of Zoological Areas or 4) circulate Governor Otter's recommendations for reconciliation of the Governor's Plan and the Proposed Plan for public review as required by FLMPA.  The APA also invalidates agency actions that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" and unsupported by the administrative record.  5 U.S.C. § 706(2)(A), (E).  BLM did not reconcile Idaho's state plans with the federal Proposed Plan "to the maximum extent practicable," and the reasons given for not doing so do not have a rational basis and are arbitrary and capricious.  BLM also adopted a "net conservation gain" mitigation standard that is not in accordance with FLPMA's UUD requirement.

This Court "may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings" on such conditions as may be required and "to the extent necessary to prevent irreparable injury."  5 U.S.C. § 705.  Plaintiffs respectfully request such relief.  Setting aside and preliminarily staying the implementation of the Great Basin ROD and Idaho LUPA is necessary to prevent irreparable injury to Plaintiffs' sovereign and statutory rights, Idaho's resources and residents, would not meaningfully harm Defendants and is in the public interest.

DATED this 23rd day of October, 2015.

Respectfully submitted,

*/s/ Cally A. Younger*
Cally A. Younger, Idaho Bar # 8987
Admitted *pro hac vice*
Office of Governor C.L. "Butch" Otter
P.O. Box 83720
Boise, ID, 83720
Phone: 208-334-2100
Fax: 208-334-3454
Email: cally.younger@gov.idaho.gov

*/s/ Samuel J. Eaton*
Samuel J. Eaton (ISB No. 8974)
Admitted *pro hac vice*
Governor's Office of Species Conservation
304 N. 8th St., Ste. 149
Boise, Idaho 83702
Phone: 208-334-2189
Fax: 208-334-2172
Email: sam.eaton@osc.idaho.gov

*/s/ Scott N. Pugrud*
Scott N. Pugrud, ISBA#8883
Admitted *pro hac vice*
Idaho Governor's Office of Energy Resources
304 North 8th Street, Suite 250
Boise, Idaho 83720
Phone: 208-332-1679
Fax: 208-332-1661
Email: scott.pugrud@oer.idaho.gov

Attorneys for C.L. "BUTCH" OTTER, in his
official capacity as Governor of the State of
Idaho

*/s/ Thomas C. Perry*
Thomas C. Perry, ISB #7203
Admitted *pro hac vice*
Marten Law PLLC
800 West Main Street, Suite 1460
Boise, ID 83702
Phone: 208-999-5900
Email: tperry@martenlaw.com

*/s/ Linda R. Larson*
*/s/ Svend A. Brandt-Erichsen*
Linda R. Larson, WSBA #9171, DC Bar
No. MI00059
Svend A. Brandt-Erichsen, WSBA #23923,
admitted *pro hac vice*
Marten Law PLLC
1191 Second Ave, Suite 2200
Seattle, WA 98101
Phone: 206-292-2600
Fax: 206-292-2601
Email: llarson@martenlaw.com
        svendbe@martenlaw.com

Attorneys for C.L. "BUTCH" OTTER, in
his official capacity as Governor of the State
of Idaho, and the IDAHO STATE
LEGISLATURE

CERTIFICATE OF SERVICE

I hereby certify that on October 23, 2015 I electronically filed the foregoing with the

Clerk of the Court for the U.S. District Court of the District of Columbia by using the court's

CM/ECF system.

DATED this 23rd day of October, 2015.

<div style="margin-left:40%">

*/s/ Thomas C. Perry*
Thomas C. Perry, ISB # 7203
Admitted *pro hac vice*

</div>